# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELIA WILLIAMS : | |
| : | |
| and : | |
| : | |
| BABY JENKINS WILLIAMS : | |
| : | |
| Plaintiffs, : | Civil Action No. |
| : | |
| v. : | JURY TRIAL DEMANDED |
| : | |
| MELISSA GREER-GRAYSON : | |
| : | |
| and : | |
| : | |
| NEIGHBORS QUALITY HOME CARE, LLC : | |
| : | |
| and : | |
| : | |
| CHERITA M. BROWN : | |
| : | |
| and : | |
| : | |
| Defendants. : | |

# COMPLAINT WITH JURY DEMAND

Plaintiffs, Angelia Williams and Baby Jenkins Williams ("Plaintiffs"), by and through their attorneys, Lechter & Sasso, P.C., file the following Complaint against Defendants Melissa Greer Grayson, Neighbors Quality Home Care, LLC, and Cherita M. Brown, (individually and collectively, "Defendants"), and aver as follows:

## I. <u>THE PARTIES</u>

1.  Plaintiff, Angelia Williams, ("Plaintiff Angelia Williams") is an adult individual residing at 216 Fieldstone Crossing Drive, Bear, Delaware 19701-1954, along with her partner,  Plaintiff Baby Jenkins Williams (individually and collectively, "Plaintiffs"). Plaintiff is, therefore, a citizen of the State of Delaware.

2.  Plaintiff, Baby Jenkins Williams, ("Plaintiff Baby Williams") is an adult individual residing at 216 Fieldstone Crossing Drive, Bear, Delaware 19701-1954, along with her partner, Plaintiff Angelia Williams (individually and collectively, "Plaintiffs", or the "Williams"). Plaintiff is, therefore, a citizen of the State of Delaware.

3.  Defendant, Melissa Greer-Grayson ("Defendant Grayson") is an adult individual residing at 11 Keeneland Court, Bear, Delaware 19701-3320. Defendant Grayson is, therefore, a citizen of the State of Delaware.

4.  Defendant, Neighbors Quality Home Care, LLC ("Defendant Neighbors") is a Pennsylvania Domestic Limited Liability Company, organized and existing under the laws of the Commonwealth of Pennsylvania, with its registered office

located at 1653 North 7th Street, Philadelphia, Pennsylvania 19122-2914. Defendant

Neighbors is, therefore, a citizen of the Commonwealth of Pennsylvania.

5.  Defendant, Cherita M. Brown ("Defendant Brown") is an adult individual

residing at 715 West Fisher Avenue, Philadelphia, Pennsylvania 19120-2725.

Defendant Brown is, therefore, a citizen of the Commonwealth of Pennsylvania.

## II. <u>JURISDICTION AND VENUE</u>

6.  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1)

because there is complete diversity of citizenship between Plaintiffs and

Defendants, and because the matter at issue exceeds $75,000, exclusive of interest

and costs.

7.  Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of

the activities giving rise to the causes of action occurred in this district and

Plaintiffs suffered injury within this district.

## III. <u>FACTS</u>

8.  Plaintiffs incorporate by reference all of the other allegations pled in this

Complaint as though set forth fully and at length herein.

9.  On Sunday, September 4, 2022, the Plaintiffs were invited to meet with

Defendants Grayson and Brown, the owners of Defendant Neighbors. During the

meeting Defendants Grayson and Brown explained to the Plaintiffs that they

needed $60,000 in cash by Monday, September 5—the next day—to pay the Leviton

Law Firm Ltd. or Defendant Neighbors would receive a second FCC filing which

would result in the closure of the business entity.

10. Defendants Grayson and Brown asked the Plaintiffs to invest $60,000 in exchange for 20% ownership of the business entity and 20% of the profit of the business entity.

11. On or about September 23, 2022, the Plaintiffs and Defendants Grayson and Brown entered into a Partnership Agreement, whereby it was affirmed that Defendants Grayson and Brown jointly owned 80% of Defendant Neighbors, and for the sale price of $60,000, the Plaintiffs would own 20% of Defendant Neighbors. Please see Exhibit B, which is attached herein and incorporated by reference.

12. The Williams paid for their 20% of Defendant Neighbors in two installments: $25,000 was paid on September 9, 2022, with a Visa credit card, and the remaining $35,000 was paid on September 22, 2022, with a Navy Federal Credit Union Cashier's Check (a copy of which is included in Exhibit B). This deal was brokered by the then attorney for Neighbors, Mia Roberts Perez.

13. The essential terms of the Partnership Agreement stipulated that Defendants Grayson and Brown would reimburse the Plaintiffs within eighteen months from September 23, 2022, and that for any purchase offers made, all partners would have the right of first refusal.

14. Notwithstanding the terms of the duly executed Partnership Agreement with the Williams, on or about November 23, 2022, Defendant Grayson totally ignored the shareholder rights of the Plaintiffs and executed a 48-page Membership Interest Purchase Agreement ("Purchase Agreement") with Citadel Home Care NJ, LLC ("Citadel") for an unadjusted Purchase Price—prior to any

adjustments in the Purchase Agreement—of Seven Hundred Twenty-Five Thousand ($725,000) Dollars. A true and correct copy of the Purchase Agreement with Citadel is attached herein and incorporated by reference as Exhibit A.

The Purchase Agreement contained the following relevant terms:

a.   upon execution of the Purchase Agreement, a Working Capital Deposit of Fifty Thousand ($50,000) Dollars was to be deposited by Defendant Citadel with Defendant Grayson; and

b.   Defendant Citadel was to deposit the sum of Two Hundred Fifty Thousand ($250,000) Dollars with its counsel, Jeffrey G. DiAmico, Esq. (of the Huntingdon Valley law firm of Semanoff Ormsby Greenberg & Torchia, LLC) acting as its Escrow Agent until the Closing or earlier termination of the Purchase Agreement.

Thereafter, on the ninety-first (91st) day following the Closing, Citadel was to pay Defendant Grayson the Post-Closing Payment (subject to any adjustments) as set forth in the Purchase Agreement.

15.   Sometime after execution of the Purchase Agreement on November 23, 2022, attorney DiAmico learned of the existence of Defendant Grayson's other shareholders and contacted the Plaintiffs.

16. In January 2023, Defendant Grayson and a representative named "Mike" from Citadel contacted Plaintiff Baby Williams and engaged in a three-way phone conversation. Mike explained that Ms. Grayson needed Baby Williams' 20% ownership rights to secure majority ownership in order to sell the company, Neighbors Quality Home Care, LLC ("Neighbors"). When Ms. Williams asked about the sale price, Ms. Grayson replied that the sale price was Two Hundred Thousand ($200,000) Dollars—an offer that was rejected by Ms. Williams.

17. Subsequently, Mike called the Plaintiffs, Baby Williams and Angelia Williams, and engaged in a three-way phone conversation. Mike explained that Citadel wanted to purchase Neighbors for a total of Five Hundred Thousand ($500,000) Dollars.

18. Ms. Grayson assured the Williams that once the sale was completed and she received all the funds from the sale, she (Ms. Grayson) would pay the Williams the balance of their initial investment and 20% of the sale price, which was One Hundred Thousand ($100,000) Dollars.

19. The Williams rejected the offer and asked Mike to pay them 20% of the sale price and the balance of the initial investment directly because they did not deem Ms. Grayson to be trustworthy and reasonably believed that she would not honor the purported agreement.

20. Mike stated that Citadel did not want to get into a dispute with the owners of Neighbors, and that Citadel only wanted the assets of Neighbors and sought to purchase the company as a whole. Mike suggested that the Williams give their 20% ownership stake to Ms. Grayson in return for Citadel holding a portion of the funds from the sale in an escrow account with Citadel, releasing the funds to Ms. Grayson **ONLY** after she paid the Williams. The Williams rejected the offer and asked Mike to pay them, directly.

21. The Williams then asked Mike about Cherita Brown's interest, as she is a 40% owner of Neighbors. Mike replied that he would reach out to his legal team to see if some resolution could be worked out to the benefit of all parties.

22.  The Williams' perception that Ms. Grayson was not trustworthy was well-founded—on January 25, 2023, Ms. Grayson unilaterally executed a First Amendment to Membership Interest Purchase Agreement ("First Amendment") on behalf of Neighbors with Citadel. The so-called First Amendment totally excluded the Williams, and divested them of any ownership interest in Neighbors. A true and correct copy of the so-called First Amendment is attached herein and incorporated by reference as Exhibit C.

23.  Subsequently, attorney DiAmico contacted the undersigned Williams' attorneys, Lynne Lechter, Esquire and Ernest Sasso, Esquire of the Philadelphia-based law firm of Lechter & Sasso, P.C.

24.  Attorneys representing Ms. Grayson and Ms. Brown have also contacted the Williams' attorneys.

25.  During February 2023, Ms. Grayson's attorney forwarded a copy of the Complaint and Consent Judgment between the United States Department of Labor ("DOL") and Ms. Grayson, concomitant with a stipulated fee of approximately One Hundred Sixty-Five Thousand ($165,000) Dollars to be paid by Ms. Grayson. The Consent Judgment was issued by the DOL because Ms. Grayson was accused of diverting Neighbors employee overtime payments to herself. A true and correct copy of the Complaint and Consent Judgment is attached herein and incorporated by reference as Exhibit D.

26. Ms. Grayson, through her attorney, has alleged that Ms. Brown was actually the person guilty for the employee overtime theft. However, because

Ms. Grayson had failed to add Ms. Brown and the Williams as shareholders in the corporate entity in the requisite update report to the Pennsylvania Department of State's Corporation Bureau—as required by Pennsylvania law— only Ms. Grayson was held responsible.

27.  Ms. Brown has denied any wrongdoing regarding payment of employee overtime hours.

28.  However, upon information and belief, to comply with Ms. Brown's and Ms. Grayson's working agreement in exchange for Ms. Brown's investment in Neighbors, Ms. Brown was invoicing Neighbors for a large amount of overtime to reach the total sum of compensation agreed to in the Purchase Agreement made between Ms. Grayson and Neighbors. The Williams attempted to negotiate a settlement with Neighbors and Ms. Grayson, but that attempt failed.

29.  Further, and upon information and belief, Ms. Grayson deliberately engaged in off shooting clients from Neighbors to a competitor—in contravention of her role as CEO of Neighbors.

## IV. CAUSES OF ACTION

## COUNT I

## **BREACH OF CONTRACT**

30.  Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein at length.

31.  It was only after the Citadel purchase offer was made that the Plaintiffs learned of Defendants Grayson and Brown's problems with the DOL. Also, they

(the Plaintiffs) learned for the very first time that Ms. Grayson had an outstanding business loan of $50,000 that was not divulged to them (the Plaintiffs) at the time of their investment in the company (Neighbors).

32. Ms. Brown breached the contract by and between the parties by, *inter alia*, not amending the ownership status of Neighbors and filing the required amendment with the Pennsylvania Department of State.

33. Ms. Grayson was obligated by the terms of the Partnership Agreement and Purchase Agreement by and between the parties to indemnify the Williams for the loss of their ownership interest in Neighbors.

34. Ms. Grayson breached her obligation to act in good faith and to deal fairly with the Williams by not informing the Williams of the true financial status of Neighbors, and by not offering them a right of first refusal, as agreed upon in ¶ 2 of the [attached] Partnership Agreement.

35. The Williams have suffered loss and damage as a result of Ms. Grayson's failure to follow the terms of their contract with Neighbors.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), together with costs of suit, interest, and attorneys' fees, as well as any such other relief as the Court deems adequate, just, and proper.

## COUNT II

## BREACH OF FIDUCIARY DUTIES

36.  Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein at length.

37.  As set forth more fully above, Defendant Grayson has breached the fiduciary obligations imposed upon her by, *inter alia*, knowingly, deceptively, and deceitfully misappropriating, wasting, abusing, converting, depleting, and/or divesting substantial assets belonging to Neighbors, namely Plaintiffs' 20% ownership interest.

38.  The acts of Defendant Grayson, as alleged more fully herein, were in violation of the trust and confidence reposed in her.

39.  Defendant Grayson's foregoing violations of her fiduciary obligations were willful, wanton, malicious, and/or taken with reckless and/or callous disregard for the rights and interests of the Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), together with costs of suit, interest, and attorneys' fees, as well as any such other relief as the Court deems adequate, just, and proper.

## COUNT III

## FRAUD

40.  Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein at length.

41.  It is believed and therefore averred that Plaintiffs have suffered irreparable harm and economic loss by Defendant Grayson's illegal activities and blatant violation of the terms of the Partnership Agreement by stripping them of their 20% ownership interest in Neighbors without justification or cause, and without consideration.

42.  As a result of her foregoing and disreputable actions, Defendant Grayson has received significant economic benefits from Neighbors for which Defendant Grayson has not provided any corresponding compensation or other equitable benefits to Plaintiffs.

43.  As a direct and consequential result of her actions, Defendant Grayson owes the Plaintiffs full restitution of their 20% ownership interest in Neighbors, in addition to 20% of the profit derived by Neighbors.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), together with costs of suit, interest, and attorneys' fees, as well as any such other relief as the Court deems adequate, just, and proper.

## COUNT IV

## DAMAGES RESULTING FROM TORTIOUS CONDUCT

44.  Plaintiffs hereby incorporate all paragraphs of this Complaint as though fully set forth herein at length.

45.  The conduct of Defendant Grayson described above constitutes her wrongful and tortious breach of the fiduciary duties she owed to Plaintiffs, as aforesaid in the agreement between the parties.

46.  The conduct of Defendant Grayson described above also constitutes the tortious interference of Plaintiffs' contract with Neighbors.

47.  Solely as a result of Defendant Grayson's wrongful conduct, Plaintiffs were frozen out of Neighbors and deprived of their 20% ownership interest at great financial loss to them that continues to grow, in an amount in excess of $75,000 that has yet to be calculated as a liquid sum.

48.  Solely as a result of Defendant Grayson's wrongful conduct, Plaintiffs were denied the economic benefit they would have received before the said wrongful conduct of Defendant Grayson, resulting in a great financial loss to them that continues to grow, and is in an amount in excess of $150,000.

49.  The conduct of Defendant Grayson was willful, wanton, outrageous, and reckless. Clearly, she had no regard to the loss and harm it would inflict on Plaintiffs, and Plaintiffs are thereby entitled to punitive damages.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants in an amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00), together with costs of suit, interest, and attorneys' fees, as well as any such other relief as the Court deems adequate, just, and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial for all issues so triable.

Respectfully submitted,

LECHTER & SASSO, P.C.

By: _____

Ernest Sasso, Esquire
Pennsylvania Attorney I.D. No. 34883
Lynne Kessler Lechter, Esquire
Pennsylvania Attorney I.D. No. 59815
1845 Walnut Street, 25th Floor
Philadelphia, Pennsylvania 19103-4725
(215) 564-6000 [Telephone]
(215) 598-0977 [Fax]
sasso@lechtersasso.com [E-Mail]
lechter@lechtersasso.com [E-Mail]

Attorneys for Plaintiffs, Angelia Williams
and Baby Jenkins Williams

Dated:  May 9, 2023

# EXHIBIT A

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT ("**Agreement**") made and entered into as of November 23, 2022 ("**Effective Date**"), by and among Melissa Greer-Grayson, with a residential mailing address of 11 Keeneland Court, Bear, DE 19701 ("**Seller**"), Neighbors Quality Home Care, LLC, a Pennsylvania limited liability company, with its principal place of business at 1 International Plaza, Suite 550, Philadelphia, PA 19113 ("**Company**"), and Citadel Home Care NJ, LLC, a New Jersey limited liability company, with its principal place of business at 13 Regency Way, Manalapan, New Jersey 07726, or its successors, assigns or nominees ("**Buyer**"). Seller, Company and Buyer each also sometimes referred to, individually, as a "**Party**" and, collectively, the "**Parties**." Any and all schedules, exhibits and attachments hereto referenced in this Agreement are hereby incorporated into this Agreement by reference and made a part hereof.

### Recitals

WHEREAS, the Company is a duly licensed and qualified home care agency provider of home care and personal care and related services to consumers of home and community-based services, including services reimbursable by the Pennsylvania Department of Human Services ("**PDHS**") Medicaid Waiver Programs and other publicly funded programs, generally known as and referred to under the applicable provisions of the 28 Pennsylvania Code Chapter 611 as a Home Care Agency and Registry and an approved Waiver Program Provider within the Commonwealth of Pennsylvania (a "**Home Care Agency**"; and, collectively, the "**Business**");

WHEREAS, Seller is the record and beneficial owner of all of the issued and outstanding membership interests (the "**Interests**") of the Company.

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of the issued and outstanding Interests of the Company on the terms and subject to the conditions set forth in this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants and other good and valuable consideration contained in this Agreement, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Purchase and Sale

    a.      Purchase and Sale of Interests. Subject to the terms and conditions of this Agreement, Buyer shall purchase from Seller, and Seller shall sell, assign, transfer, convey, set over and deliver to Buyer, and/or to Buyer's successors and assigns or nominee(s), at the Closing (as defined in Section 2(a) below), the Interests, free and clear of any Liens (hereinafter defined), debts, encumbrances, obligations or liabilities, and together with all accrued rights and benefits attached thereto.

  b. <u>Company Assets</u>. Buyer shall buy all of Seller's Interests in the Company, which Interests include all of the Company's rights, title and interest in and to the Company's Assets (hereinafter defined), free and clear of all liens and encumbrances or with full and complete knowledge of any assumed liabilities which, if any, are specifically set-forth in writing in this Agreement. The Company Assets shall include all furniture, fixtures and equipment, including without limitation, all assets of Seller used in or related to the operating of the Business, whether tangible or intangible, real, personal or mixed, and wherever located, including without limitation, all furniture, fixtures, equipment, computers, software, software licenses, hardware, books and records, telephone numbers, website(s) and domain, trade names, marketing materials, contracts, accounts receivable, bank accounts, inventory, customers, customer lists, material handling equipment, intellectual property, goodwill, prepaid expenses and all transferable licenses and permits, and all relevant materials in place as of the date of this Agreement to be maintained through Closing (collectively the "**Assets**").

  c. <u>Assumed Liabilities</u>: Except as expressly provided in this Paragraph 1(c), the purchase by Buyer of the Interests will be free and clear of all security interests, liens, pledges, obligations, defenses, claims, set-offs, restrictions and encumbrances, and without any assumption by Buyer of any debts, taxes, obligations, or liabilities of Seller or the Company whatsoever, whether actual or contingent, known or unknown, asserted or unasserted, liquidated or unliquidated (collectively, "**Liabilities**"). By way of illustration and not limitation, Buyer is NOT assuming any of the following Liabilities of Seller or the Company related to: litigation, union contracts, Employee benefit plans (including, without limitation, pension fund liabilities), taxes, environmental claims, accounts payable or warranties. Notwithstanding the foregoing, Buyer will assume the Company's current customer contracts. The provisions of this paragraph shall survive Closing.

  d. <u>Purchase Price; Payments</u>

  (1) <u>Purchase Price</u>. The final sum payable by Buyer, as full consideration for the Interests, after any and all adjustments herein, and inclusive of the Holdback Payment (hereinafter defined) and Post-Closing Payment (hereinafter defined) shall be the "**Purchase Price.**" Except as otherwise specifically set-forth in this Agreement, all Purchase Price payments shall be paid by Buyer to Seller on the due date(s) via cashier's check or wire transfer to an account designated in writing by Seller not less than two (2) Business Days prior to the payment date, of immediately available funds.

  (2) <u>Unadjusted Price</u>. The unadjusted Purchase Price prior to any and all adjustments in this Agreement, shall be Seven Hundred Twenty-Five Thousand ($725,000) Dollars.

  (3) <u>Deposits and Post-Closing Payment</u>.

(a)     Deposits.

i.      Working Capital Deposit.    Upon execution of this Agreement by the Parties, Buyer shall deposit the sum of Fifty Thousand ($50,000) Dollars with Seller (the "**Working Capital Deposit**"), to be held by Seller until Closing or earlier termination of this Agreement);

ii.     Escrow Deposit. Upon execution of this Agreement by the Parties, Buyer shall deposit the sum of Two Hundred Fifty Thousand ($250,000) Dollars with Buyer's counsel, Jeffrey G. DiAmico, Esq. (Semanoff Ormsby Greenberg & Torchia, LLC), escrow agent ("**Escrow Agent**"), to be held in escrow until Closing or earlier termination of this Agreement ("**Escrow Deposit**", and together with the Working Capital Deposit, collectively, the "**Deposit**"). At Closing, subject to all terms and conditions of this Agreement, Buyer shall authorize Escrow Agent to release the Escrow Deposit to be paid over to the Seller; and thereafter, on the ninety-first (91st) day following Closing, Buyer shall pay to Seller the Post-Closing Payment (hereinafter defined), subject to any adjustments pursuant to this Section 1(d)(3).

iii.    Failure to Close.  If Closing does not occur on or before the Closing Date, Seller and Escrow Agent shall immediately return the Deposit to Buyer.

iv.     Survival.  This Section 1(d)(3) shall survive Closing or the termination of this Agreement.

(b)     Holdback.  Subject to the restrictions and adjustments set forth in this Section 1(e)(3)(b), Buyer shall pay to Seller Two Hundred Twenty-Five Thousand ($225,000) Dollars (the "**Holdback Amount**").

i.      Indemnification Adjustment.  The Holdback Amount is the non-exclusive remedy for Buyer's recovery of monetary damages resulting from the matters referred to in, and/or other sums subject to indemnification under, this Agreement, if there is any default or breach of this Agreement.

ii.     Holdback Payment.  The Holdback Amount constitutes a sum payable by Buyer to Seller after the expiration of the one (1) year anniversary immediately following the Closing Date ("**Holdback Period**"), less any amounts that have been claimed or are the subject of unresolved claims asserted by Buyer in accordance with this Agreement. The Buyer will pay Seller all or the applicable portion of the Holdback Amount within ten (10) business days after the end of the Holdback Period.

iii.    Closing Costs.  The Parties have no knowledge of any Closing costs, sales, transfer, or recording taxes, escrow fees, or similar costs, fees, or expenses arising in connection with the Purchase/Sale Transaction.  If any such Closing costs, fees, or expenses arise, the Parties shall bear them on an equal, 50/50 basis (unless the accrual of the

same arises out of a breach of a Party's representations, warranties, or covenants herein, in which case the breaching Party shall bear 100% responsibility). The Parties shall bear their own attorneys' fees and costs in connection with the negotiation, drafting, finalization, execution, and delivery of this Agreement.

        iv.        Prorations and Adjustments for Liabilities; Accounts Payable. With respect to the Company's accounts payable, the Seller is responsible for all payments, obligations, and other liabilities owing and/or accrued under the accounts payable for the period ending on the Closing Date. Such expenses shall include, without limitation, any and all known and unknown open payables, inclusive of those related to annual contracts, annual incentives, and similar programs, and further inclusive of any Liabilities, including without limitation tax liabilities or obligations of the Company and/or the Seller as it relates to the Business of the Company. Without limiting the foregoing, if any accounts payable required Company or Seller to make a deposit or to prepay certain fees or costs for a period not ending on the Closing Date, then the Parties shall calculate reasonably and in good faith an appropriate pro rata apportionment of the relevant amounts, such pro rata shares corresponding to the percentage attributable to the pre-Closing and post-Closing periods. Such agreed upon amounts will be added to or subtracted from the Post-Closing Payment and/or the Holdback Amount, if such agreed upon amounts, or any portions thereof, occurs following the Post-Closing Payment.

        v.        Any and all claims, accounts payable or Liabilities that are determined during the Holdback Period by Buyer to be the responsibility of the Company and/or the Seller (provided that the event leading to such claim, accounts payable or Liability occurred prior to Closing) shall be satisfied first from the Holdback Amount during the Holdback Period.

        (c)        Post-Closing Payment. Subject to the restrictions and adjustments set forth in this Section 1(d)(3)(c), Buyer shall pay to Seller the Post-Closing Payment.

        i.        Post-Closing Payment Period. The Post-Closing Payment constitutes a sum payable by Buyer to Seller after the expiration of ninety-one (91) days immediately following the Closing Date ("**Post-Closing Payment Period**"). As a condition precedent to Buyer's payment to Seller of the Post-Closing Payment:

        a.        at least ninety five percent (95%) of Company's Caregivers (hereinafter defined) scheduled to deliver service in the month following the Closing, will have remained Caregivers of the Company through the end of the Post-Closing Payment Period. "**Caregivers**" includes all the caregivers (regardless of whether they are employees or independent contractors) of the Company, including those that have worked with any of Company's clients, patients, and/or customers (collectively, "**Clients**"); and

        b.        at least ninety five percent (95%) of Company's Clients actively receiving and/or scheduled to receive care services in the month following the

Closing, will have remained Clients of the Company through the end of the Post-Closing Payment Period.

        c.    in the event that each of the conditions precedent set-forth in Sections 1(d)(3)(c)(i)(a)&(b) above are met, subject to the below thresholds the following amount(s) shall be paid by Buyer to Seller (the "**Post-Closing Payment**"):

        i.    in the event that on the Closing Date, the immediately preceding two-weeks of total revenue of the Company prior to the Closing Date is equal to or greater than 105% of the immediately preceding two-weeks of total revenue of the Company prior to the Effective Date, then the Post Closing Payment shall equal five percent (5%) of the Purchase Price; or

        ii.    in the event that on the Closing Date, the immediately preceding two-weeks of total revenue of the Company prior to the Closing Date is equal to or greater than 110% of the immediately preceding two-weeks of total revenue of the Company prior to the Effective Date, then the Post Closing Payment shall equal ten percent (10%) of the Purchase Price.

        iii.    Subject to the adjustments set-forth in this Section 1(d)(3), Seller shall only be entitled to one (1) and not both of the above-referenced possible Post-Closing Payments, if at all.

        d.    in the event that each of the conditions precedent set-forth in Sections 1(d)(3)(c)(i)(a)&(b) above are not met, but at least eighty percent (80%) of the Company's Caregivers and at least eighty percent (80%) the Company's Clients remained with the Company through the end of the Post-Closing Payment Period, then the Post-Closing Payment, if any, shall be reduced by fifty percent (50%), if either of the total revenue thresholds in Sections 1(d)(3)(c)(i)(c) are reached by the Company.

        e.    in the event that each of the conditions precedent set-forth in Sections 1(d)(3)(c)(i)(a)&(b) above are not met, but at least seventy-five percent (75%) of the Company's Caregivers and at least seventy-five percent (75%) of the Company's Clients remained with the Company through the end of the Post-Closing Payment Period, then the Post-Closing Payment, if any, shall be reduced by seventy five percent (75%), if either of the total revenue thresholds in Sections 1(d)(3)(c)(i)(c) are reached by the Company.

        f.    in the event that less than seventy five percent (75%) of the Company's Caregivers or less than seventy five percent (75%) of the Company's Clients remained with the Company through the end of the Post-Closing Payment Period, then the Post-Closing Payment shall be zero ($0) dollars, and no Post-Closing Payment will be due and owing by Buyer to Seller, regardless if either of the total revenue thresholds in Sections 1(d)(3)(c)(i)(c) are reached by the Company.

g.      The Buyer will pay Seller all, or the applicable portion, of the Post-Closing Payment, if any, within ten (10) business days after the end of the Post-Closing Payment Period.

f.      Liens. Seller shall ensure that the Interests of Seller, and the Assets, rights, and properties of the Company relating to the Business are free and clear of all liabilities, pledges, obligations, charges, tenancies, claims, security interests, exceptions, mortgages, liens or other encumbrances (collectively, **"Liens"**) at the time of the sale.

2.  Closing; Closing Deliveries.

a.      Closing. The consummation of the transactions (the **"Closing"**) contemplated by this Agreement shall take place on or before three (3) business days following the Buyer's receipt of written evidence of notice, consent and approval of: (i) the Change of Ownership and Control by PDHS, Office of Long Term Living-Human Services Licensing Department (**"PDHS-OLTL"**), contemplated by this Transaction; (ii) the Change of Ownership and Control by the Pennsylvania Department of Health (**"PaDOH"**), contemplated by this Transaction; and (iii) notice, consent and approval of continuation (and non-termination) of each of the MCO Provider Agreements (hereinafter defined); each all of which must be obtained no later than February 28, 2023 (the **"Closing Date"**). Buyer may extend the Closing Date, in Buyer's sole and absolute discretion, in the event each of the Seller's Closing Deliveries (hereinafter defined) in Section 2(b) are not obtained, and Conditions Precedent (hereinafter defined) in Section 14(a) are not completed, on or before February 28, 2023. The Closing shall take place at the office of Buyer's attorney, or by mail or electronic means of communication, if practicable, on the Closing Date. All transactions and deliveries contemplated by this Agreement (the **"Transactions"**) shall take place contemporaneously, and no such transaction shall be deemed completed or consummated until all such transactions are completed or consummated. Subject to the terms and conditions of this Agreement, on the Closing Date, Buyer shall be deemed to purchase all of the Interests of the Company and become the effective owner of the Interests. The Closing shall be effective as of 12:00 a.m. of the morning of the Closing Date.

b.      Seller's Closing Deliveries. If not previously provided, at the Closing, in addition to any other documents specifically required to be delivered pursuant to this Agreement, Seller shall, in form and substance reasonably satisfactory to Buyer and its counsel, deliver (or cause to be delivered) to Buyer the following (collectively, the **"Seller's Closing Deliveries"**):

i.  Membership Interest Certificates evidencing the Interests, duly endorsed in blank or accompanied by powers or other instruments of transfer duly executed in blank, with all required transfer tax stamps affixed thereto;

ii.  Evidence of the release of any Liens, including, if any, duly executed payoff letters;

iii.   A certificate, duly executed by an officer of Company and dated as of the Closing Date, certifying to Buyer those matters set forth in Sections 14(a) of this Agreement;

iv.   A certificate, duly executed by an officer of Company and dated as of the Closing Date, certifying to Buyer that: (a) the execution, delivery and performance of this Agreement and the consummation of the Transactions has been duly authorized by the members, managers and directors of Company, as applicable; and (b) such resolutions have not been rescinded or modified and remain in full force and effect as of the Closing Date;

v.   A certificate, duly executed by Seller and dated as of the Closing Date, certifying to Buyer that: (a) the execution, delivery and performance of this Agreement and the consummation of the Transactions has been duly authorized by Seller;

vi.   IRS Form W-9, executed by Seller;

vii.   A list of all of the Company's creditors as of the Effective Date;

viii.   A list of consumers currently under care of the Company as of the Effective Date;

ix.   Written evidence of notice, consent and approval of the Change of Ownership and Control by the PDHS-OLTL contemplated by this Transaction;

x.   Written evidence of notice, consent and approval of the Change of Ownership and Control by the PaDOH contemplated by this Transaction;

xi.   Written evidence of notice, consent and approval of the Change of Ownership and Control, and the continuation (and non-termination) of each of the MCO provider agreements that the Company has with the following MCO providers (collectively, the **"MCO Provider Agreements"**): Keystone First; UPMC; and PA Health and Wellness (collectively, the **"MCO Providers"**).

xii.   Written evidence that the MCO Provider Agreements are in full force and effect as of the Closing Date, have not been terminated, and will remain in full force and effect as of and following the Closing Date;

xiii. Assignment of Interests, evidencing the sale and transfer of the Interests from the Sellers to the Buyer; and

xiv. Such other instruments of conveyance or other documents reasonably deemed necessary by Buyer and its counsel to affect the Transaction.

b. <u>Buyer's Closing Deliveries</u>. At the Closing, in addition to any other documents specifically required to be delivered pursuant to this Agreement, Buyer shall deliver to Seller:

    i. Bank check(s) or wire transfer(s) in the amounts required under Section 1(d) of this Agreement;

    ii. A certificate, duly executed by an officer of Buyer, dated as of the Closing Date, certifying to Seller those matters set forth in Sections 14(b) of this Agreement.

3. <u>Obligations of the Parties; Transition Matters</u>.

a.     <u>General</u>. Each Party shall use reasonable efforts to accomplish an orderly transition of the Company and the Business to Buyer.

b.     <u>Stub Year</u>. It is the intent of the Parties that the taxable year of the Company will close for federal income and all other tax purposes at 11:59 a.m., Eastern time, on the Closing Date, and that the Parties will treat such taxable year as a "stub year" and will not prorate the parties' tax obligations. Seller and the Company shall provide reasonable cooperation and assistance to Buyer to give effect to this intent.

c.     <u>Consents</u>.

(1)     <u>Pennsylvania Department of Human Services</u>. Within three (3) business days after the Effective Date, Buyer shall file such application(s) and/or make such written requests as are required by statute, regulation, and/or law to obtain approval from the PDHS-OLTL, for a change in the structure of the Company, or a change in the Company's ownership, management, and/or control, such that the Company will be authorized to continue operations with such ownership changes.

(2)     <u>Pennsylvania Department of Health</u>. Within three (3) business days after the Effective Date, Buyer shall file such application(s) and/or make such written requests as are required by statute, regulation, and/or law to obtain approval from the PaDOH for a change in the structure of the Company, or a change in the Company's ownership, management, and/or control, such that the Company will be authorized to continue operations with such ownership changes.

(3)     MCO Provider Agreements.   Within three (3) business days after the Effective Date, Buyer shall file such applications and/or make such written requests as are required to obtain the approval from the MCO Providers for a change in the structure of the Company, or in the Company's ownership, management, and/or control, such that the Company will retain applicable coverage under the MCO Provider Agreements.

(4)     Seller's Obligations. Seller and the Company agree to, and shall cooperate with Buyer to facilitate the transfer and approval of the above noted licenses, contracts and Provider Agreements, including by providing necessary information for the approvals/consents, and by executing any and all documents required to effectuate the approval process for change in ownership, management and control of the Company.

d.     Termination.

(1)     Failure to Obtain Consents. If the Company has failed to obtain written consents/approvals/confirmations from any of the PaDOH, PDHS-OLTL, and/or MCO Providers, authorizing the change in ownership and management of the Company on or before February 28, 2023, and if all such conditions for approval have not been waived, in writing, by Buyer, then Buyer may, in its sole and absolute discretion, terminate this Agreement upon written notice to Seller.

(2)     License Cancellation . If any operating or other license(s) for the Business and/or any of the MCO Provider Agreements have been cancelled or terminated at any time, for any reason, prior to February 28, 2023, then Buyer may, in its sole and absolute discretion, terminate this Agreement upon written notice to Seller.

(3)     Effect of Termination.  If this Agreement is terminated pursuant to this 0: (i) Seller shall immediately return the Working Capital Deposit to Buyer; (ii) Buyer shall direct Escrow Agent to release and return the entirety of the Escrow Deposit to Buyer; and (iii) each of the Parties shall be relieved of its duties and obligations arising under this Agreement as of the date of such termination and this Agreement shall have no further force or effect. Notwithstanding the foregoing, all terms and provisions that, by their terms, should survive termination of this Agreement shall survive such termination.

e.     Due Diligence.  The Company and Seller will, upon reasonable prior notice and at reasonable times and without undue interruption to the business operations of the Company, provide Buyer, and its agents, access to all contracts, books and records relating to the Interests, Assets, Business, Liabilities, operations, and business plans with respect to the Company.

4. Representations and Warranties of Seller. Seller represents and warrants to Buyer as of the Effective Date and the Closing Date, as follows:

a.     Organization; Good Standing. The Company is a limited liability company duly organized and validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. The Company is duly qualified to transact business in all other jurisdictions in which the nature of the Business or the character of the properties owned or leased by the Company requires such qualification. The Company is not in violation of any provision of its

Certificate of Organization, bylaws, operating agreement or code of regulations (as applicable and each as amended to date). Neither Seller nor the Company owns or controls, directly or indirectly, any interest in any other corporation, partnership, limited liability company, trust, joint venture, association, or other entity. The Company's Organization Documents, including its Certificate of Organization, Operating Agreement, and Good Standing Certificate are attached hereto as Schedule 4(a).

b.    Power; Authority; Capitalization. Seller and Company have the full power and authority to: (a) own and/or hold under lease their respective assets and properties; (b) carry on the Business as currently conducted; and (c) execute and deliver this Agreement, to perform their obligations under this Agreement, and to consummate the Transaction. Seller owns one hundred percent (100%) of the issued and outstanding certificated and non-certificated membership interests of the Company.

c.    Due Authorization. Each of: (a) the execution and delivery by Seller of this Agreement; (b) the performance by Seller of its obligations under this Agreement; and (c) the consummation of the Transactions, has been duly authorized and approved by Seller.

d.    Non-Contravention. The execution and delivery by Seller of this Agreement, the performance by Seller of its obligations under this Agreement, and the consummation by Seller of the Transactions do not and shall not: (a) conflict with; (b) result in any violation of or default (with or without notice or lapse of time or both) under; (c) give rise to a right of termination, cancellation, or acceleration under; (d) result in the creation or imposition of any Lien under; or (e) result in the loss of a material benefit under or with respect to: (i) any provision of the Company's Certificate of Organization, operating agreement, bylaws or code of regulations (as applicable and each as amended to date); (ii) any provision of applicable law; (iii) any judgment, order, decree, ruling, charge, or other restriction of any court or other agency of government; (iv) any agreement, contract, indenture, loan agreement, note, lease or other agreement or instrument to which either Seller or the Company is a party or by which either Seller or the Company is bound, or to which any assets or properties of Seller or the Company is subject; or (v) any permit, approval, or license of Seller or the Company.

e.    Binding Obligations. This Agreement and other Transaction Documents have been duly executed and delivered by Seller and constitute legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

f.    No Consents. Seller, either on its own behalf or on the behalf of the Company, is not required to give any notice to, make any filing with, or obtain any authorization, consent, permit, certificate, or approval of, any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign

("**Government Entity**") or third party in order to consummate the Transaction, except as described on Schedule 4(f) ("**Seller's Required Notices and Consents**").

  g.  <u>Litigation</u>.

      i. Except as described on Schedule 4(g), there is no (i) action, suit, claim, proceeding, audit, inquiry or investigation ("**Action**") pending or threatened against or affecting Seller or the Company, at law or in equity, by or before any Government Entity; or (ii) mediation or arbitration proceeding relating to Seller or the Company pending under any collective bargaining agreement or otherwise, and Seller is not aware of any basis for any of the foregoing. There is no action, suit, claim, or proceeding by Seller or the Company pending or threatened against others.

      ii. Neither Seller nor the Company are a party or subject to the provisions of any order, writ, injunction, judgment, or decree of any court or of any Government Entity.

  h.  <u>Legal Compliance</u>. Seller has been, currently is, and has caused the Company to be, in compliance with all laws, rules, ordinances, codes, regulations, and judicial orders ("**Laws**") that are applicable to Seller and/or the Company including, but not limited to, (i) the Health Insurance Portability and Accountability Act of 1996, as amended ("**HIPAA**"), including the Privacy Rule and the Security Standards and including the amendments set forth in the amendments to HIPAA set forth in Division A, Title XIII of the American Recovery and Reinvestment Act of 2009, known as The Health Information Technology for Economic and Clinical Health Act or "**HITECH Act**"; (ii) all laws in the Commonwealth of Pennsylvania applicable to the insurance fraud, improper fee splitting, restrictions or prohibitions on referral of government-funded business, privacy and security of medical records; (iii) the False Claims Act (31 U.S.C. § 3729 et seq.) and any equivalent state laws; (iv) the fraud and abuse provisions of Section 1128B of the Social Security Act and 42 U.S.C. § 1320a-7b, 42 U.S.C. § 1395nn and any equivalent state laws; (v) Title VII of the Civil Rights Act of 1964; (vi) the Age Discrimination in Employment Act of 1967 and any rules or regulations thereunder promulgated by the U.S. Department of Health and Human Services, or any other Government Entity; or (vii) any applicable and comparable fraud and abuse or anti-discrimination statutes and regulations promulgated by any other Government Entity. Neither Seller nor the Company have received any notice from, and have not provided any notice to, any Government Entity or other person or entity of any violation of any Law.

  i.  <u>Permits</u>. The Company has all licenses, permits, authorizations, accreditations, registrations, certificates, and other approvals (collectively, the "**Permits**") required by all Laws necessary for the conduct and operation of the Business as currently conducted. Schedule 4(i) sets forth a complete and accurate list and description of all Permits and Seller has provided Buyer with true, correct and complete copies thereof. All of the Permits are unexpired and are in

full force and effect. The Company is in compliance in all respects with the provisions thereof, and there are no outstanding violations, notices of noncompliance, or judicial or administrative actions, proceedings, or investigations relating to any such Permit. No loss, suspension, impairment, non-renewal, or revocation of any such Permit is pending or threatened and there is no basis for any of the foregoing. No Permit is subject to any material restriction or limitation except as set forth on the face of such Permit.

j.    Healthcare Matters.

i.   The Company is authorized to provide Home Care Services (as defined in Section 4(j)(vi) of this Agreement) in Philadelphia and contiguous counties. Seller and the Company have no affiliations, agreements and/or other arrangements with hospitals, nursing facilities, other "health care facilities," medical or other practices, durable medical equipment companies or other health care providers or suppliers.

ii.  Seller shall deliver to Buyer true, correct and complete copies of all accreditation reports, if any, all survey reports, and licensure survey reports, including any statements of deficiencies and plans of correction received from or generated with respect to Seller or the Company during the past 24-month period. Seller has no outstanding health and safety deficiencies and there are no uncured deficiencies with respect to Seller or the Company.

iii. The Company is eligible to receive payment without restriction under those federal and state programs, including Pennsylvania Medicaid and Pennsylvania Medicaid Home and Community Based Programs through the Community Health Choices Payors, has a PROMISe, National Provider Identifier number(s), and other Government Programs contract numbers which are listed on Schedule 4(j)(iii). The Company is and, since its inception, has been in compliance with the conditions of participation for the Government Programs, and there is no pending or threatened Action under any Government Program involving either Seller or the Company.

iv.  The Company has timely filed or caused to be timely filed and, as to reports due after the Closing, shall timely file, any necessary cost reports that are required to have been filed with respect to the Company for all times prior to the Closing Date including, but not limited to, cost reports required under the Government Programs. True and correct copies of all such cost reports, if any, for the three (3) most recent calendar years shall be provided to Buyer. There are no reports, filings, documents or other materials filed or required to be filed by Seller or the Company with any

Governmental Entity during the last three (3) years, other than returns and reports relating to income taxes, annual reports to the Commonwealth of Pennsylvania, reports to health care agencies from the federal and state governments, all of which have been timely filed.

v. Since the inception of the Company, each Health Care Professional (as defined below in this Section 4(j)(v)) who has provided any clinical services/ direct care to or on behalf of the Company has been, and each such Health Care Professional currently is, duly licensed or certified, as applicable, to practice his or her profession in the Commonwealth of Pennsylvania. With respect to services performed on behalf of the Company, each Health Care Professional has provided services solely within the scope of his or her training and, as applicable, licensure or certification. Seller has provided to Buyer, or otherwise made available to Buyer, complete copies of all such professional licenses and specialist certifications of the Health Care Professionals. As used in this Agreement, the term **"Health Care Professional"** means any individual required to be licensed, certified or otherwise registered to provide the clinical/direct care services provided by such individual to the Company, who is employed by or an independent contractor of the Company and who has provided home health services to the Company. A true and complete list of all Health Care Professionals is attached to this Agreement as Schedule 4(j)(v).

vi. Since the inception of the Company, each Home Care Provider (as defined below in this Section 4(j)(vi)) who has provided any home care services to or on behalf of the Company has been, and each such Home Care Provider currently is, in compliance with all Laws, including, but not limited to, Laws about the permitted scope of Home Care Services to be provided by Home Care Providers. As used in this Agreement, the term **"Home Care Provider"** means any individual who is not licensed, certified or otherwise registered to provide clinical services, but who has provided any Home Care Services (as defined below) to, or on behalf of, the Company and who is employed by or an independent contractor of the Company. As used in this Agreement, **"Home Care Services"** means the following activities, as defined by 28 Pa. Code § 611.5, including but not limited to: (i) personal care; (ii) assistance with instrumental activities of daily living; (iii) companionship services; (iv) respite care; and (v) specialized care. A true and complete list of all Home Care Providers is attached to this Agreement as Schedule 4(j)(vi).

vii. Since the inception of the Company, no Company staff, Health Care Professional or Home Care Provider: (i) has been sanctioned, excluded, debarred, had a billing privilege revocation or loss of Payor credentialing,

or was disciplined by any licensing board or any other Government Entity or professional association; (ii) has had a final judgment or settlement without judgment entered against it, him or her arising out of, or relating to, any claimed negligence or errors or omissions by it, him or her; (iii) has been the subject of any criminal complaint, indictment or criminal proceeding; (iv) has been the subject of any proceeding relating to an allegation of submitting false health care claims, violating anti-kickback, Stark or other self-referral or fee-splitting laws, or engaging in improper billing practices in violation of any other applicable law; or (v) has been subject to any investigation or proceeding based on any allegation of violating professional ethics or standards, or engaging in illegal conduct, relating to his or her services or practice.

viii. Neither Seller nor any officer, member, manager, employee, agent, equity holder or managing employee (as such term is defined in 42 U.S.C. § 1320a-5(b)) of the Company is or has been: (i) excluded or debarred or had a billing privilege revocation or has been suspended from participation in any federal (as defined in 42 U.S.C. § 1320a-7b(f)) and/or state health care programs, (ii) subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8, or (iii) convicted of a crime described at 42 U.S.C. § 1320a-7b, nor is any such exclusion, debarment, revocation, termination, sanction or conviction pending or threatened.

ix. Neither Seller nor the Company (i) are a party to any corporate integrity agreement with any Government Entity; (ii) have reporting obligations pursuant to any settlement agreement entered into with any Government Entity; (iii) have been a defendant or a target in any qui tam/False Claims Act or similar litigation; (iv) have been served with or received any search warrant, subpoena, civil investigative demand, contact letter or telephone or personal contact by or from any federal or state enforcement agency; and (v) have received any written complaints or complaints through its telephonic hotlines or other methods of communication from employees, contractors, vendors, or any other person that would indicate that Seller or the Company has in the past violated, or are currently in violation of, any applicable Law.

x. The Company currently has, and since its inception has had, billing practices, including compliance with quality data and claims submission and receipt of payments, that are in compliance with all applicable Laws and Payor policies and rules. The Company has paid or shall pay, in the ordinary course of business and as applicable, all discovered undisputed refunds, overpayments, discounts and adjustments which it is obligated to pay related to services provided prior to the Closing Date under any

contract, and there is no pending or threatened Action by any Payor with respect to any such report or billing. The Company has not been audited by any Payor, other than in the ordinary course of business. The Company has timely filed all applications or other forms to provide updates to enrollment or credentialing data to all Payors. The Company has no outstanding liability under any Payor agreement or program for any refund, overpayment, discount or adjustment.

  xi. MCO Provider Agreements automatically renewed, are in full force and effect as of the Effective Date, have not been terminated, and will remain in full force and effect as of and following the Closing Date.

  k. <u>Assets; Leased Personal Property</u>. The Company has good and marketable title to all of the assets, rights, and properties of the Company, free and clear of any and all Liens. All of the assets, rights, and properties are free from material defects (patent and latent), have been maintained in accordance with good business practice and industry standards, and are in good operating condition and repair (normal wear and tear excepted). All of the leased personal property is in the condition required of such property by the terms of the applicable lease during the term of such lease and upon the expiration thereof. The personal property leases include all software and other third-party rights that are necessary to operate and use the applicable leased property for its intended purpose.  of the Company's or Seller's assets are registered with the United States Patent and Trademark Office.

  l. <u>Financial Information</u>. To the extent that Seller has the following financial information available, attached to this Agreement as Schedule 4(l) are the following (collectively, the **"Financial Information"**): (a) the unaudited balance-sheet statements, as of October 31, 2022, of the Company and the related unaudited income and loss statement for the ten-month period then ended, and the statement of cash flows, (b) the unaudited balance sheet of the Company for the periods ended as of December 31, 2021 and December 31, 2020, and the related unaudited income/loss statements and statements of cash flows for the fiscal year period then ended. The Financial Information: (1) has been prepared in accordance with generally accepted accounting principles; (ii) is true, complete and accurate in all material respects; (iii) is consistent with the books of account of the Company; and (iv) presents fairly the financial condition and results of operations of the Company for the periods covered thereby. Except as disclosed in the Financial Information, the Company does not have any liabilities, whether absolute, contingent, fixed, matured, unmatured, liquidated, unliquidated, choate, inchoate, secured, unsecured or otherwise and whether due or to become due. Since December 31, 2021, the Company has operated in the ordinary course of business consistent with past practice and there has been no change in the Company's financial condition or business prospects, the condition of the assets of the Company, employee relations, relations with providers or sources of referrals, or patient relations.

m.     Taxes. The Company has failed to timely file appropriate tax returns and reports (federal, state and local) required to be filed by it for itself and on behalf of the Company, and all such tax returns and reports are and shall remain the responsibility of the Company and the Seller. All taxes owed by the Company (whether or not shown on any tax returns to be completed) shall be paid by the Company and/or the Seller for all periods prior to the Closing Date. If any such taxes remain unpaid, Buyer may, but is not obligated to, treat them as a Liability and Buyer may, but is not obligated to, pay the taxes out of, and deduct them from, the Holdback Amount. The Company has withheld or collected from each payment made to each of its employees, the amount of all taxes (including, but not limited to, federal income taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) required to be withheld or collected therefrom and has paid the same to the proper taxing authority or authorized depositories. No claim has been made by any Government Entity in a jurisdiction where the Company does not file tax returns that the Company is or may be subject to taxation by that jurisdiction. The Company is not a party to any tax allocation or sharing arrangement. The Company is not currently the beneficiary of any extension of time within which to file any tax return, nor has the Company waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency of the Company.

n.     Material Contracts. Schedule 4(n) sets forth a complete list of all written or oral: (i) Agreements or arrangements involving future obligations (contingent or otherwise) of, or payments to, the Company in excess of $5,000; (ii) agreements or arrangements with any physician, registered nurse, hospital, pharmacy and/or medical equipment supplier, nursing facility or other in-patient health care facility, hospice, another home health agency, school or other educational institution, health maintenance organization, preferred provider organization or self-insured employer, accountable care organization or any other type of bundled payments or risk sharing arrangement, Payor; (iii) contracts for the sale of goods or the rendering of services continuing for a period of more than thirty (30) days from the date of this Agreement or from the Claims Date; (iv) contracts for the purchase of supplies, materials, or services for delivery over a period of more than thirty (30) days from the date of this Agreement or from the Claims Date; (v) contracts or agreements of any kind continuing for a period of more than one (1) year from the date of this Agreement or from the Claims Date; (vi) agreements or arrangements purporting to restrict the business activity of the Company or limit the freedom of the Company to engage in any line of business or to compete with any individual or entity; (vii) employment or service agreements; (viii) agreements or arrangements under which the Company has borrowed or loaned, or has caused the Company to borrow or loan, any money and/or granted any lien or security interest in the Company's assets; (ix) agreements or arrangements under which the Company guaranteed the obligations of any third party or any third party has guaranteed the obligations of the Company; (x) leases or other agreements under which the Company is lessee of or holds or operates any property, real or personal, owned by any other party; (xi) leases or other agreements under which the Company is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by the Company; (xii) agreements or arrangements involving the transfer or license of any patent, trademark, copyright, trade secret, software, or other intellectual property to or from the Company; (xiii) agreements or

arrangements that grant "most favored nation" or similar status to any individual or entity; (xiv) agreements or arrangements requiring indemnification by the Company; and (xv) agreements or arrangements that purport to bind Buyer following the Closing (each, as amended or supplemented to date, a "**Material Contract**"). Each Material Contract was entered into on an arms-length basis, is valid, binding and enforceable against the Company and the other parties thereto in accordance with its terms, and is in full force and effect. The Company has performed all obligations required to be performed by it to date under each Material Contract, and neither the Company nor any other party thereto is in default under any Material Contract. No event has occurred which with the passage of time or the giving of notice or both would result in a material default, breach or event of noncompliance by the Company nor any other party under any Material Contract. The Company has not received any notice of any threatened cancellation of any of the Material Contracts, and there are no outstanding disputes thereunder. Seller has delivered to Buyer a true, correct, complete copy of each Material Contract.

o.      ERISA. Each employee benefit plan maintained by the Company (and each related trust, insurance contract, or fund) has been maintained, funded and administered in accordance with the terms of such employee benefit plan and complies in form and in operation with the applicable requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Code. Each such employee benefit plan which is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code has received a determination letter from the Internal Revenue Service to the effect that such employee benefit plan meets the requirements of Section 401(a). With respect to each employee benefit plan that the Company maintains or has maintained since its inception or to which the Company contributes or has been required to contribute at any time since its inception, no action, suit, proceeding, hearing, or investigation with respect to the administration or the investment of the assets of such employee benefit plan (other than routine claims for benefits) is pending or threatened.

p.      Employees and Independent Contractors. The Company is operating and always has operated in compliance with all applicable Laws regarding employment and employment practices (including Laws regarding terms and conditions of employment, nondiscrimination, equal opportunity, immigration, benefits, payment of employment, social security and similar Taxes, occupational safety and health, plant closings and wages and hours). The employment of each of the Company's employees is terminable at will. None of the Company's personnel has a Claim against the Company including, without limitation, any Claim with respect to (i) overtime pay other than overtime pay for the current payroll period, (ii) wages or salaries other than wages or salaries for the current payroll period or (iii) vacation, sick leave or time off, other than vacation, sick leave or time off (or pay in lieu thereof) arising in the ordinary course of business. The Company has no Liability to provide medical or other welfare benefits to former employees (or to employees after termination of employment), their spouses or dependents or any other individual not employed by the Company. The Company has made all required payments to the relevant unemployment compensation reserve accounts with the appropriate Governmental Authorities with respect to its employees and such accounts have positive balances.

q.      Intellectual Property. The Company owns, or has the legal right to use, all patents, trademarks, trade names, service marks, domain names, copyrights, trade secrets, mask works, and other intellectual property (the "Intellectual Property") necessary for the Company to conduct the Business as currently conducted. All such Intellectual Property is listed on Schedule 4(q). No claim has been asserted and is pending by any third party challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does Seller know of any such claim, and the use of such Intellectual Property by the Company does not infringe on the rights of any third party. No person is infringing upon or otherwise violating any Intellectual Property owned by or used in connection with the Company.

r.      Affiliate Transactions. No current or former Company's Personnel: (i) has any direct or indirect interest of any nature in any asset, right, or property, tangible or intangible, used in the conduct of the Business; (ii) is a party to or has any direct or indirect financial interest in, any contract or agreement, including, but not limited to, the Material Contracts, to which the Company is a party or the assets, rights, and properties of the Company are bound; (iii) is competing, directly or indirectly, with the Company in any market served by the Company; (iv) has or has asserted any claim or right against the Company that is unresolved; or (v) owns an interest in a vendor or supplier of the Company.

s.      Certain Business Practices. Neither Seller nor the Company has paid any commission or made any payment whether to secure business or otherwise to any person which in the hands of such person would in accordance with applicable Law be regarded as illegal or improper. No Company's Personnel or other person acting on behalf of the Company has been a party to the use of any assets of the Company for unlawful contributions, gifts, entertainment or other unlawful expenses relating to any activity, including any political activity, or to the establishment or maintenance of any unlawful or unrecorded fund of monies or other assets, or to the making of any false or fictitious entries in the books or records of the Company, or to the making of any unlawful payment.

t.      Solvency. The Company is not, and after giving effect to the transactions contemplated by this Agreement shall not be, "insolvent" within the meaning of Section 101(32) of title 11 of the United States Code.

u.      Insurance. Seller shall deliver to Buyer a copy of each insurance policy maintained with respect to the Company and/or the assets, rights, and properties of the Company (including but not limited to professional liability insurance), and each such policy is and shall be in full force and effect through and including the Closing Date.  Seller and Company warrant that they have disclosed all claims have been made pursuant to any such insurance maintained by or with respect to the Company. The Company has maintained in effect during the operation of the Business general and professional liability insurance with annual limits of no less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) in the aggregate, and if applicable, workers compensation insurance meeting applicable statutory limits, property

insurance, and auto liability insurance. All of the Company's insurance policies are "occurrence" policies and not "claims made" policies. All premiums due on such policies have been paid and no notice of modification, cancellation or termination or intent to cancel has been received by the Company with respect to such policies.

v.      Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Seller or the Company.

w.      Full Disclosure. No representation or warranty made by Seller in this Agreement or in any exhibit, schedule, certificate, document or other written instrument furnished or to be furnished pursuant hereto contains or will contain any untrue statement of any material fact, nor shall any such certificate, document or written instrument omit any material fact which is necessary in order to make any statement herein or therein, in light of the circumstances in which it was made, not misleading. Seller has not withheld from Buyer any information that is material to the assets, liabilities, prospects, financial condition or results of operations of Seller and Company.

x.      Real Property. Seller agrees Company is current under the terms of the lease agreement between Company and the owner/landlord ("Lease") for the premises ("**Leased Real Property**") located at 1 International Plaza, Suite 550, Philadelphia, PA 19113, and not in default under the Lease through the Closing Date, or Seller shall disclose any deficiency or default to Buyer prior to the Closing Date, to which Buyer is not responsible. In addition to all financial obligations contained in the Lease, Seller shall be responsible for any CAM or other charges incurred under the Lease up to the Closing Date, regardless of when the CAM is assessed by the Landlord.

> i.   Except as disclosed in Schedule 4(x)(i), there is no material violation of any Law (including, without limitation, any building, planning or zoning Law) relating to any of the Leased Real Property.
>
> ii.  Neither Seller nor the Company has received any notice of cancellation or termination under the Lease relating to the Leased Real Property and no lessor has any right of termination or cancellation thereunder except upon a breach or default by the Company.
>
> iii. There are no condemnation proceedings or eminent domain proceedings of any kind pending or threatened against the Leased Real Property.
>
> iv.  All the Leased Real Property is occupied under a valid and current certificate of occupancy or similar Permit. The Transactions contemplated by this Agreement will not require the issuance of any new or amended certificate of occupancy and there are no facts that would prevent the

Leased Real Property from being occupied by the Company after the Closing in the same manner as occupied by the Company immediately prior to the Closing.

v.   No improvements on the Leased Real Property and none of the current uses and conditions thereof violate any applicable deed restrictions or other applicable covenants, restrictions, agreements, existing site plan approvals, zoning or subdivision regulations, urban redevelopment plans or similar Laws.

vi.   The rental obligation set forth in the Lease of the Leased Real Property is the actual rent being paid thereunder, and there are no separate agreements or understandings with respect to the same.

vii.   The Company has the full right to exercise any renewal options contained in the Lease pertaining to the Leased Real Property on the terms and conditions contained therein and upon due exercise would be entitled to enjoy the use of the Leased Real Property for the full term of such renewal options.

y.     <u>Affiliation.</u> The Company has no affiliates or subsidiaries.

5.   <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller, as of the Effective Date and the Closing Date, as follows:

a.     <u>Organization; Good Standing</u>. Buyer is a limited liability company duly formed, validly existing, and in good standing under the laws of New Jersey.

b.     <u>Power; Authority</u>. Buyer has the full power and authority to: (i) own or hold under lease its assets and properties; (ii) carry on its business as currently conducted; and (iii) execute and deliver this Agreement, to perform its obligations under this Agreement, and to consummate the Transactions.

c.     <u>Due Authorization</u>. Each of: (a) the execution and delivery by Buyer of this Agreement; (b) the performance by Buyer of its obligations under this Agreement; and (c) the consummation of the Transactions has been duly authorized and approved by all necessary corporate action by Buyer.

d.     <u>Non-Contravention</u>. The execution and delivery by Buyer of this Agreement., the performance by Buyer of its obligations under this Agreement, and the consummation by Buyer of the Transactions and thereby do not and shall not: (a) conflict with; (b) result in any violation of or default (with or without notice or lapse of time or both) under; (c) give rise to a right of termination, cancellation, or acceleration under; (d) result in the creation or imposition of any

Lien under; or (e) result in the loss of a material benefit under or with respect to: (i) any provision of Buyer's articles of organization or operating agreement (each as amended to date); (ii) any provision of applicable Law; (iii) any judgment, order, decree, ruling, charge, or other restriction of any court or other agency of government; or (iv) any contract or agreement to which Buyer is a party or by which Buyer is bound, or to which any of Buyer's assets or properties is subject.

e.      Binding Obligations. This Agreement constitutes the legal, valid and binding obligation of Buyer, and shall be enforceable against Buyer in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

6. Seller Insurance Obligations. Seller shall cooperate with Buyer to effectuate the continuation of the insurance policies necessary to operate the Business, including effectuating notices of the Interests purchase to the insurance providers.

7. Records. Upon Closing, Seller shall effectuate the transfer of any and all records held by Seller in connection with the Business, including any membership interest certificates, books, or records of the Company being held by the Seller. Seller shall have no further right to inspect any records of the Company.

8. Company Employees.

a.      Seller shall provide to Buyer three (3) days prior to the Closing Date documentation of all accrued wages, salary, severance, termination payments, and benefits of the employees of the Company through the Closing Date. The Company shall notify all employees and contractors of the Transaction and perform all other actions mandated by Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), as codified in Section 4980B of the Code and that are required to be given, collected, or otherwise performed as a result of the Transaction.

b.      Following the Closing, Buyer shall not take or omit to take, or cause the business to take or omit to take, any action that would cause Seller or the Company to be in violation of or in default under, or otherwise trigger any liability under, the Worker Adjustment Retraining and Notification Act of 1988 (WARN), as amended, or any similar applicable state laws.

9. Change of Name; Restrictions on Dissolution. From and after the Closing Date, Seller shall not make any further use of: (a) the name "Neighbors Quality Home Care" or any derivative thereof, or (b) any other name that, in Buyer's reasonable judgment, is sufficiently similar to said name or otherwise so as to potentially cause confusion with the acquired Business.

10. Restrictive Covenants.

a.      Confidential Information. Seller and the Company and its respective employees, contractors, affiliates and other agents shall: (i) keep secret, confidential and hold in the strictest confidence all of the Confidential Information (as defined below in this Section 10(a) of the Agreement); (ii) not disclose any Confidential Information to any third party; and (iii) deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in Seller's, the Company's or Seller's or the Company's employees' or agents' possession; provided, however, that this prohibition shall not apply to any item of Confidential Information which is otherwise generally publicly available or if the disclosing Party consents to such disclosure or transfer in writing in advance. In the event that Seller or the Company is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller or the Company shall notify Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 10(a). If, in the absence of a protective order or the receipt of a waiver under this Agreement, Seller or the Company is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, then Seller or the Company may disclose the Confidential Information to such tribunal; provided, however, that Seller or the Company shall use its reasonable best efforts to obtain, at the reasonable request of Buyer and at Buyer's expense, an order or other assurance that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate. As used in this Agreement, the term "Confidential Information" means any and all information concerning the Company that is not generally available to the public as of the Effective Date.

b.      Non-Competition. During the period commencing on the Closing Date and ending on the five (5) year anniversary thereof (the "Restricted Period"), Seller shall not, directly or indirectly, individually or otherwise engage in the Restricted Business (as defined below) within the Restricted Area (as defined below). As used in this Section 10: (a) the term "Restricted Business" means the provision or management of, or consulting for, directly or indirectly, a business providing Home Care Services to consumers; and (b) the term "Restricted Area" means Philadelphia County, the Counties in which the Company operates, and any contiguous Counties thereto.

c.      Non-Solicitation. During the period commencing on the Closing Date and ending on the five (5) year anniversary thereof, Seller shall not, directly or indirectly, individually or as a director, officer, employee, consultant, independent contractor, stockholder, partner, manager, member, joint venturer, or owner of (or as a lender or financier to) any company, business, enterprise, or entity: (a) solicit, encourage, or induce (or attempt to solicit, encourage, or induce) any client, customer, patient or referral source with whom Seller or the Company had a business relationship prior to the Closing to refrain from or cease doing business with (or alter or reduce its business relationship with) Buyer, or to commence or expand a similar business relationship with any other individual or entity; (b) solicit, encourage, or induce (or attempt to solicit,

encourage, or induce) any provider, supplier, business partner, contractor, licensor, licensee, landlord, lessor, or other entity with whom Seller or the Company had a business relationship prior to the Closing to refrain from or cease doing business with (or alter or reduce its business relationship with) Buyer; (c) solicit, encourage or induce (or attempt to solicit, encourage or induce) any of Buyer's employees or service contractors to leave the employ or service of Buyer, or in any way interfere with the relationship between Buyer and its employees and/or service contractors; and/or (d) hire or engage or attempt to hire or engage any person who was an employee of Buyer until six (6) months after such person's employment with Buyer has ended.

      d.    <u>Reasonableness and Necessary Remedies; Interpretation.</u>

          i.  Each Party acknowledges and agrees that: (i) each term of this Section 10 is fully required to protect the Parties' respective interests and that none confers a benefit on one Party that is disproportionate to the detriment imposed on the other Party; (ii) the remedy at law for any breach by either Party of any term of this Section 10 of this Agreement would be inadequate; (iii) the damages flowing from such breach are not readily susceptible to measurement in monetary terms; and (iv) each Party shall be entitled to immediate injunctive relief restraining any proven breach of this Section 10 by the other Party, without having establish the type or nature of its damages or to post a bond or other security. Nothing in this Agreement shall be deemed to limit the disclosing Party's remedies at law or in equity for any such breach by the other Party in connection with this Section 10 of this Agreement.

          ii.  Seller acknowledges and agrees that the restrictions and covenants set forth in Section 10 of this Agreement: (i) are in consideration of Buyer's agreements under this Agreement, and (ii) are fair and reasonable, in terms of scope, subject matter, geographic area, duration, and otherwise, and that the protections afforded to Buyer are necessary to protect its legitimate business interests. In addition, Seller acknowledges that the potential harm to Buyer of the non-enforcement of the provisions of Section 10 of this Agreement outweighs any harm to Seller of their enforcement by injunction or otherwise. Each provision of Section 10 of this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses hereof. If one or more of such provisions shall for any reason be held to be unenforceable, such provision or provisions shall be construed by the appropriate judicial body so as to be enforceable to the maximum extent compatible with applicable law.

          iii.  Seller acknowledges and agrees that any breach of the provisions of Section 10 of this Agreement may cause irreparable harm to Buyer.

Accordingly, Buyer shall be entitled, in addition to any other remedies that may be available at law or in equity (including, without limitation, monetary damages), to seek injunctive or other equitable relief in connection with any breach or threatened breach thereof, without the necessity of posting bond or other security.

iv.   In addition to any other remedies that Buyer may seek and obtain pursuant to this Agreement, the duration of the restrictions set forth in Section 10(b) and/or Section 10(c) of this Agreement shall be extended by any and all periods of time during which either Seller, or any of their representatives, shall be claimed by legal action to have been in violation of any provision thereof.

e.      <u>Prior Agreements</u>. The provisions of this Section 10 are in addition to, and not in limitation of, any other restrictive covenants or confidentiality obligations set forth in any other or ancillary agreement between either Seller, on the one hand, and the Buyer and/or an affiliate thereof, on the other hand.

11. <u>Survival; Indemnification</u>.

a.      <u>Survival</u>. The representations, warranties and covenants made in this Agreement shall survive the Closing and the consummation of the Transactions and shall survive any independent investigation by Buyer or Seller, and any dissolution, merger or consolidation of Buyer or Seller and shall bind the legal representatives, permitted assigns and successors of Buyer and Seller.

b.      <u>Indemnification Provisions for Benefit of Buyer</u>. Seller shall indemnify, defend (at Buyer's request) and hold harmless Buyer and its affiliates, subsidiaries, directors, officers, stockholders, partners, managers, members, employees, agents, representatives, successors, and assigns (each an "Indemnified Buyer Party") from and against, and shall pay to each Indemnified Buyer Party the amount of, any and all losses, liabilities, claims, damages, costs (including, without limitation, court costs), and expenses (including, without limitation, expenses of investigation and defense and reasonable attorneys' fees) (collectively, "Damages") which any such Indemnified Buyer Party incurs as a result of or in connection with: (a) any inaccuracy in or breach of any representation or warranty of either Seller set forth in in this Agreement; (b) any inaccuracy in or breach of any covenant or agreement of either Seller set forth in this Agreement; (c) the operation or conduct of the Company prior to the Closing Date; (d) the actions or activities of any employees, contractors or agents of Seller or the Company or any of their affiliates prior to the Closing, and (e) any of the matters set forth in Schedules 4(f) and/or 4(g). For purposes of this Agreement, Damages shall include consequential and punitive damages only if awarded pursuant to a Third Party Claim.

c.      Indemnification Provisions for Benefit of Seller. Buyer shall indemnify and hold harmless Seller and its affiliates, subsidiaries, directors, officers, stockholders, partners, managers, members, employees, agents, representatives, successors, and assigns (each an "Indemnified Seller Party") from and against, and shall pay to each Indemnified Seller Party the amount of, any and all Damages which any such Indemnified Seller Party incurs as a result of or in connection with: (a) any inaccuracy in or breach of any representation or warranty of Buyer set forth in this Agreement; or (b) any inaccuracy in or breach of any covenant or agreement of Buyer set forth in this Agreement.

d.      Third Party Claims.

i.   If a person who is not a Party to this Agreement or an affiliate of a Party to this Agreement or a representative of the foregoing shall notify any Indemnified Buyer Party or Indemnified Seller Party (the "Indemnitee") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against another Party to this Agreement (the "Indemnitor") under this Section 11, then the Indemnitee shall promptly notify the Indemnitor thereof in writing; provided, however, that no delay on the part of the Indemnitee in notifying the Indemnitor shall relieve the Indemnitor from any obligation under this Agreement unless (and then solely to the extent) the Indemnitor is materially prejudiced thereby.

ii.  The Indemnitor shall have the right to defend the Indemnitee against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnitee so long as: (i) the Indemnitor notifies the Indemnitee in writing within fifteen (15) days after the Indemnitor has received notice of the Third Party Claim that the Indemnitor shall indemnify the Indemnitee from and against the entirety of any Damages the Indemnitee may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the extent required by the provisions of this Agreement; (ii) the Indemnitor makes reasonably adequate provision to satisfy the Indemnitee of the Indemnitor's ability to defend, satisfy and discharge such Third Party Claim; (iii) the Third Party Claim does not seek an injunction or other equitable relief; (iv) settlement of, or an adverse judgment with respect to, the Third Party Claim is not reasonably likely to establish a precedential custom or practice materially adverse to the continuing business interests of the Indemnitee; (v) the Third Party Claim does not relate to or arise in connection with any alleged criminal or fraudulent action; and (vi) the Indemnitor promptly commences and conducts the defense of the Third Party Claim diligently.

iii. So long as the Indemnitor is conducting the defense of the Third Party Claim in accordance with Section 11(d)(ii) above: (i) the Indemnitee may

retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim; (ii) the Indemnitee shall not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnitor (which consent shall not be unreasonably withheld or delayed); and (iii) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld or delayed). Notwithstanding the foregoing, the fees and expenses of separate counsel for the Indemnitee shall be borne by the Indemnitor if: (y) legal conflicts of interest pursuant to applicable rules of professional conduct exist between the Indemnitor and the Indemnitee; or (z) the Indemnitee shall have been advised in writing by counsel for the Indemnitee that a defense exists for the Indemnitee which is not available to the Indemnitor.

iv.  In the event any of the conditions in Section 11(d)(ii) above is or becomes unsatisfied, (i) the Indemnitee may defend against the Third Party Claim in any manner it reasonably may deem appropriate, (ii) the Indemnitor shall reimburse the Indemnitee promptly and periodically for the costs of defending against the Third Party Claim (including, without limitation, reasonable attorneys' fees and expenses), (iii) the Indemnitor shall remain responsible for any Damages the Indemnitee may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Section 11, and (iv) the Indemnitor may retain separate co-counsel at its sole cost and expense and participate in (but not control) the defense of the Third Party Claim.

e.  Direct Claims. Any claim by an Indemnitee on account of Damages that does not result from a Third Party Claim (a "Direct Claim") shall be asserted by the Indemnitee giving the Indemnitor prompt written notice thereof; provided, however, that no delay on the part of the Indemnitee in notifying the Indemnitor shall relieve the Indemnitor from any obligation under this Agreement unless (and then solely to the extent) the Indemnitor is materially prejudiced thereby. Such notice by the Indemnitee shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof within Indemnitee's possession, and shall indicate the estimated amount, if reasonably practicable, of the Damages that have been or may be sustained by the Indemnitee. The Indemnitor shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such thirty (30) day period, the Indemnitor shall make such investigation of the Direct Claim as is considered necessary or desirable. For the purpose of such investigation, the Indemnitee shall make available such information as the Indemnitor may reasonably request, but only to such extent as would not impair the attorney client privilege and/or attorney work product protections. If the Indemnitor does not so respond within such thirty (30) day period, the Indemnitor shall be deemed to have

rejected such claim, in which case the Indemnitee shall be free to pursue such remedies as may be available to the Indemnitee on the terms and subject to the provisions of this Agreement.

f.      Payment. The Indemnitee shall be entitled to payment from the Indemnitor promptly upon (but in no event later than fifteen (15) days after) final determination of any claim for Damages for which indemnification is due, whether as a result of a settlement, judgment or other resolution of the claim. Any payment not made within such time period shall bear interest at the Wall Street Journal Prime Rate plus three percent (3%) per annum, payable on demand, from the due date until the payment date, and the Indemnitee shall also be entitled to payment of all collection costs (including reasonable attorneys' fees and costs). All indemnification payments under this Section 11 shall be deemed adjustments to the Purchase Price. In the event that Seller shall be obligated to make payment on account of an indemnity obligation pursuant to Section 11(b) of this Agreement to any Indemnified Buyer Party, then such Indemnified Buyer Party shall first seek payment via an offset of the balance to be paid by Buyer to Seller hereunder, if any.

g.      Indemnification and Insurance Coverage. The amount of Damages payable by an Indemnitee under this Section 11 shall be reduced by any insurance proceeds actually recovered by the Indemnitee with respect to the claim for which indemnification is sought.

h.      Exclusive Remedy. Except with respect to claims for fraud or equitable relief and claims under Section 10 above, from and after the Closing the rights of the Buyer Indemnified Parties and the Seller Indemnified Parties, as applicable, under this Section 11 shall be the sole and exclusive remedies of the Buyer Indemnified Parties and Seller Indemnified Parties, as applicable, with respect to claims under, or otherwise relating to the Transactions.

12. Further Assurances. Each of the Parties to this Agreement shall furnish such information, to do all acts and things, and to execute and deliver such agreements, documents, certificates, and instruments as shall from time to time be reasonably required to effectuate the terms and provisions of this Agreement.

13. Certain Matters Pending Closing.

a.      Mutual Covenants Pending Closing. During the period between the Effective Date and the Closing or termination of this Agreement pursuant to Section 15 of this Agreement:

              i. Each of Seller and Buyer shall use commercially reasonable efforts to take all action and to do all things necessary, proper or advisable in order to consummate and make effective the Transactions (including satisfaction, but not waiver, of the closing conditions set forth in Section 14 below).

             ii. Each of Seller and Buyer shall use commercially reasonable efforts to timely give all notices and to obtain as promptly as practicable all

consents, approvals, waivers, authorizations, permits, licenses and estoppel certificates of all governmental authorities or third parties required to timely consummate the Transactions.

iii.   The Company shall be operated in the ordinary course of business consistent with past practice and in compliance in all material respects with all applicable laws and permits. The Company shall use commercially reasonable efforts to keep its business and properties substantially intact and shall not sell, assign, transfer or otherwise dispose of the properties or assets (or any portion thereof) without the prior written consent of Buyer (which consent shall not be unreasonably withheld), except in the ordinary course of business. The Company shall keep all property and assets in good operating condition and repair (subject to normal wear and tear). Seller and the Company shall use commercially reasonable efforts to maintain its relationships and goodwill with lessors, licensors, suppliers, customers, employees, insurance companies, managed care organizations, referral sources and others having business dealings with Seller. Seller shall not amend, modify, extend, renew or terminate any liabilities without the prior written consent of Buyer (which consent shall not be unreasonably withheld).

iv.   Seller shall give prompt written notice to Buyer of any event, occurrence or development causing a breach of any of the representations and warranties in Section 4 of this Agreement. Buyer shall give prompt written notice to Seller of any event, occurrence or development causing a breach of any of the representations and warranties in Section 5 of this Agreement. No disclosure by Seller or Buyer pursuant to this Section 13(a)(iv), however, shall be deemed to prevent or cure any misrepresentation, breach of warranty or breach of covenant of this Agreement.

v.   Seller and the Company shall provide Buyer and its representatives reasonable access to the executive officers, properties, offices, and books and records of Seller and the Company, and shall furnish Buyer with such financial, operating, and other data and information with respect to Seller and the Company as Buyer may reasonably request.

b.   Between the Effective Date and the earlier of: (a) the Closing; or (h) the termination of this Agreement, neither Seller, the Company, nor any of their owners, members, stockholders, managers, employees or agents shall, directly or indirectly: (i) solicit, initiate, consider, encourage or accept any other proposals or offers from any individual or entity: (A) relating to any acquisition or purchase of all or any portion of the ownership interests of the Seller or the Company, or (B) enter into any merger, consolidation, business combination,

recapitalization, reorganization or other extraordinary business transaction involving or otherwise relating to Seller, the Company or any of the property or assets of the Company; or (ii) participate in any discussions, conversations, negotiations or other communications regarding, or furnish to any other individual or entity any information with respect to, or otherwise cooperate in any way with, assist or participate in, or facilitate or encourage any effort or attempt by any other individual or entity to seek to do any of the foregoing. Seller and Company immediately shall cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with any persons conducted heretofore with respect to any of the foregoing. Seller shall notify Buyer promptly if any such proposal or offer, or any inquiry or other contact with any individual or entity with respect thereto, is made and shall, in any such notice to Buyer, indicate in reasonable detail the identity of the individual or entity making such proposal, offer, inquiry or contact and the terms and conditions of such proposal, offer, inquiry or other contact. Seller and the Company shall not, without the prior written consent of Buyer, release any individual or entity from, or waive any provision of, any confidentiality or standstill agreement to which Seller or the Company is a party.

14. Closing Conditions.

a.      Conditions Precedent to Closing by Buyer. Buyer's obligations to complete the Transactions shall be subject to the satisfaction of the following conditions, any or all of which may be waived in writing in whole or in part by Buyer (collectively, the "**Conditions Precedent**"):

> i.   Accuracy of Representations and Warranties. Each of Seller's representations and warranties set forth in this Agreement shall have been true and correct in all respects on the Effective Date and during the period between the Effective Date and the Closing Date, and shall be true and correct in all respects as of the Closing Date as though made on and as of such date (except those representations and warranties that address matters only as of a specified date);
>
> ii.  Performance by Seller. Seller shall have performed all obligations and agreements and complied with all covenants and conditions set forth in this Agreement to be performed or complied with by Seller at or prior to the Closing;
>
> iii. No Injunction. No action, suit, claim, proceeding, or investigation shall be pending or threatened before any court or governmental agency which presents a substantial risk of the restraint or prohibition of Transactions, or the obtaining of material damages or other relief in connection therewith;

    iv.  <u>Deliveries</u>. Seller shall have delivered to Buyer timely each of the documents or other items required of Seller under Section 2(b) of this Agreement;

    v.  <u>No Material Adverse Change</u>. No event or condition shall have occurred or exist since the date of this Agreement which would reasonably be expected to cause or result in a material adverse effect on the Business;

    vi.  <u>Filing of Notices and Consents</u>. Buyer shall have confirmed that all of Seller's Required Notices and Consents that are required to be filed prior to Closing were timely filed and obtained;

    vii.  <u>Permits</u>. Buyer shall have obtained all Permits; and

    viii.  <u>Post-Closing Notices</u>. Buyer shall have obtained commercially reasonable evidence confirming that within a reasonable amount of time after the Closing Date, Buyer's Required Notices and Consents that are not permitted to be submitted pre-Closing shall be issued post-Closing, effective as of the Closing Date;

    b.  <u>Conditions Precedent to Closing by Seller</u>. The obligation of Seller to consummate the Transactions is subject to and conditioned upon the satisfaction, at or prior to the Closing, of each of the following conditions:

    i.  <u>Performance by Buyer</u>. Buyer shall have performed and complied, in all material respects, with all of the terms, provisions and conditions of this Agreement to be performed and complied with by Buyer at or prior to the Closing;

    ii.  <u>No Injunction</u>. No injunction, restraining order, judgment or decree of any court or governmental authority shall exist against any of the Parties to this Agreement or any of their officers, directors or representatives, which restrains, prevents or materially alters the Transactions; and

    iii.  <u>Closing Deliveries</u>. Buyer shall have delivered to Seller each of the documents or other items required of Buyer under Section 2(c) of this Agreement.

15. <u>Termination</u>.

    a.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date, as follows:

      i.  by mutual written agreement of Seller and Buyer;

      ii.  by Buyer if Seller is in material breach of this Agreement, and such breach remains uncured for twenty (20) days after Seller's receipt of written notice thereof from Buyer; or

      iii.  by Seller if Buyer is in material breach of this Agreement, and such breach remains uncured for twenty (20) days after Buyer's receipt of written notice thereof from Seller.

      b.    Effect of Termination. In the event of termination of this Agreement by either Party in accordance with the applicable provisions of this Section 15, this Agreement shall terminate and be of no further force or effect except for such provisions which expressly survive termination of this Agreement, and there shall be no liability of any nature on the part of the Parties to each other, except for liabilities arising from a breach of this Agreement prior to such termination.

      c.    Expenses; Taxes. Except as otherwise expressly provided in this Agreement, each of the Parties shall bear its respective expenses incurred in connection with the preparation, negotiation, execution, and performance of this Agreement Transactions, including, without limitation, all fees and expenses of agents, representatives, counsel, and accountants. In addition, all sales, use, stamp, conveyance, documentary, and other transfer taxes payable in connection with the Transactions shall be paid by Seller.

16. Miscellaneous.

      a.    Fair Market Value; No Referrals. The Purchase Price represents fair market value of the Business in accordance with applicable Laws, including but not limited to, the federal Anti-kickback Law (42 U.S.C. § 1320a-7b), and the Federal Physician Self-Referral Law (the "Stark law," 42 U.S.C. § 1395nn), and the regulations promulgated thereunder. No part of the consideration or covenants set forth in this Agreement is contingent upon, or related in any way to, the volume or value of, referrals of business reimbursable under a government funded healthcare program between the Parties. No amount paid or to be paid under this Agreement is intended to be, nor shall it be construed to be, an offer, inducement or payment, whether directly or indirectly, overtly or covertly, for the referral of patients by any Party to any other Party or for recommending or arranging the purchase, lease or order of any item or service. No benefit conferred under this Agreement shall be in return for the referral of patients or business between the Parties.

      b.    Further Assurances. From time to time after the Closing Date, upon the reasonable request of any Party, any other Party shall execute and deliver or cause to be executed and delivered such further instruments of conveyance, assignment and transfer and take such further action as the requesting Party may reasonably request in order to effectuate fully the

purposes, terms and conditions of this Agreement. This Section 16(b) shall survive the Closing and the consummation of the Transactions.

    c.    Public Announcements. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of Buyer and Seller. After the Closing, no Party may issue any press release or otherwise make any public announcement disclosing the Purchase Price or any Confidential Information (which the Parties acknowledge does not include the mere existence of the Transaction), except to the extent required by applicable Law. The Parties acknowledge that the provisions of this Section 16(c) shall not restrict communications between a Party and the investors or lenders (or potential investors or lenders) of such Party or any of its affiliates.

    d.    Specific Performance. Seller recognize that if Seller refuses to perform under the provisions of this Agreement or any other agreements or instruments provided for in this Agreement, then monetary damages alone may not be adequate to compensate the Buyer for its injury. Buyer therefore shall be entitled, in addition to any remedies that may be available at law or in equity (including, without limitation, monetary damages), to seek specific performance of the Seller's obligations under this Agreement. If any action is brought by Buyer to specifically enforce this Agreement or any other agreements or instruments provided for by this Agreement, then the Seller shall waive the defense that there is an adequate remedy at law. The Buyer's rights under this Section 16(d) are in addition to, and not in limitation of, the Buyer's rights under Section 10(d) above.

    e.    Entire Agreement; Amendment; and Waivers. This Agreement and any related agreements constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement, and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions of the Parties, whether oral or written. No amendment, supplement, or modification of this Agreement shall be valid or enforceable unless set forth in writing and signed by all Parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement, whether or not similar, unless otherwise expressly provided in writing signed by the Party against whom such waiver is asserted.

    f.    Expenses. Except as otherwise specifically provided in this Agreement, whether or not the Transactions are consummated, each of the Parties shall pay the fees and expenses of its respective counsel, accountants and other experts incident to the negotiation, drafting and execution of this Agreement and the consummation of the Transactions.

    g.    Benefit; Assignment. This Agreement shall be binding upon and shall inure to the benefit of and shall be enforceable by Buyer and Seller and their respective proper successors and assigns. This Agreement (and any rights, obligation or liabilities under this Agreement) may not be assigned or delegated in whole or in part by Seller without the prior written consent of Buyer.

h.      Notices. All communications or notices required or permitted by this Agreement shall be in writing and shall be deemed to have been given: (1) on the date of personal delivery to the other Party; (ii) when sent by electronic mail, telecopy or facsimile machine to the number specified by the Party on the date of such confirmed electronic mail, facsimile or telecopy transmission (if transmitted on a business day during normal business hours and if not transmitted on a business day during normal business hours, then on the next business day); (iii) when properly deposited for delivery by a nationally-recognized commercial overnight delivery service, one (1) business day after being deposited with the delivery service with all delivery fees prepaid; or (iv) when deposited in the United States mail, certified or registered mail, postage prepaid, return receipt requested, five (5) business days after being deposited with the United States Postal Service, postage prepaid and designated as certified with return receipt requested, and properly addressed to the addressee as follows, unless and until either of such Parties notifies the other in accordance with this Section 16(h) of a change of address or email:

If to Seller:        Melissa Greer-Grayson
                     11 Keeneland Court
                     Bear, DE 19701

If to Buyer:         Citadel Home Care NJ, LLC
                     13 Regency Way
                     Manalapan, New Jersey 07726

With Copy To:        Jeffrey G. DiAmico, Esq.
                     Semanoff Ormsby Greenberg & Torchia, LLC
                     2617 Huntingdon Pike
                     Huntingdon Valley, PA 19006

i.      Counterparts; Headings. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same Agreement. This Agreement may be executed and delivered in counterpart signature pages executed and delivered via .pdf, electronic mail, facsimile transmission, and any such counterpart so executed shall be deemed an original for all intents and purposes. The section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part of this Agreement.

j.      Severability. If any provision, clause or part of this Agreement or the application thereof under certain circumstances is held invalid or unenforceable, the remainder of this Agreement, or the application of such provision, clause or part under other circumstances, shall not be affected thereby.

k.      Interpretation. Should any provision of this Agreement require interpretation or construction, the entity interpreting or construing the same shall not apply a presumption that the terms shall be more strictly construed against one Party by reason of the rule of construction that

a document is to be construed more strictly against the Party which itself or through its agent prepared the same, it being agreed that the agents of each Party have participated in the preparation of this Agreement and any related agreements.

l.        Exhibits and Schedules. All exhibits and schedules to this Agreement and any related agreement are hereby made a part of this Agreement and any related agreement to which they are attached.

m.       Saturdays, Sundays and Holidays; Time is of the Essence. In the event that the last day for taking any action under this Agreement falls on a weekend, a national holiday observed by the United States Postal Service, or a Party's religious holiday, the deadline for taking such action shall be extended to the next business day after such weekend or holiday. Time is of the essence with respect to all matters in this Agreement.

n.       Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflict of law principles. Legal proceedings commenced by either Party arising out of any of the transactions or obligations contemplated by this Agreement shall be brought exclusively in the courts of the Commonwealth of Pennsylvania or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of Pennsylvania. The Parties irrevocably and unconditionally submit to the personal and subject matter jurisdiction of such courts and shall take any and all future action necessary to submit to the jurisdiction of such courts. The Parties each irrevocably waive any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding brought in any such court, and further irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

o.       Third Party Beneficiaries. Notwithstanding anything set forth in this Agreement to the contrary, no individual or entity shall be deemed a third party beneficiary of this Agreement.

p.       Income Tax Position. Neither Buyer nor Seller shall take a position for income tax purposes which is inconsistent with this Agreement.

q.       Rules of Construction. The use in this Agreement of the term "including" means "including, without limitation." The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole, including the schedules and exhibits, as the same may from time to time be amended, modified, supplemented or restated, and not to any particular section, subsection, paragraph, subparagraph or clause set forth in this Agreement. All references to sections, schedules and exhibits mean the sections of this Agreement and the schedules and exhibits attached to this Agreement, except where otherwise stated. The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require or permit. Where specific language is used to clarify by example a general

statement set forth in this Agreement, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.

*(Signature and Notary Pages Follow)*

IN WITNESS WHEREOF, intending to be legally bound, the Parties to this Agreement have executed this Agreement under seal as of the Effective Date.

WITNESS:                                              SELLER:

*Brianna Taylor*

Name: *Brianna Gil*                                   Melissa Greer-Grayson

STATE/COMMONWEALTH OF Delaware                        :

COUNTY OF New Castle                                  :

On this 23rd day of November, 2022, before me, the undersigned officer, personally appeared Melissa Greer-Grayson, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purpose therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

NOTARY PUBLIC

COMPANY:

NEIGHBORS QUALITY HOME CARE, LLC

Attest: *Brianna Taylor*
Name: *Brianna Taylor*

By: _____
Melissa Greer-Grayson,
Sole Member, CEO and President

STATE/COMMONWEALTH OF _Delaware_                    :
                                                     :
COUNTY OF _New Castle_                               :

On this 23rd day of November, 2022, before me, the undersigned officer, personally appeared Melissa Greer-Grayson, who acknowledged herself to be the CEO, PRESIDENT and SOLE MEMBER of the said NEIGHBORS QUALITY HOME CARE, LLC, and that she, as such officers and member, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the entity by herself as CEO, PRESIDENT and SOLE MEMBER.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
*NOTARY PUBLIC*

BUYER:

CITADEL HOME CARE NJ, LLC

Attest:_____          By: _____

Name:_____          Cheskel Spitzer, Sole Member

---

STATE/COMMONWEALTH OF New York _____ :

COUNTY OF Kings _____ :

On this 23rd day of November, 2022, before me, the undersigned officer, personally appeared Cheskel Spitzer, who acknowledged himself to be the SOLE MEMBER of the said CITADEL HOME CARE NJ, LLC, and that he, as such member, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the entity by himself as SOLE MEMBER.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.



NOTARY PUBLIC

## List of Schedules

| | |
|---|---|
| Schedule 4(a) | Seller Organizational Documents |
| Schedule 4(f) | Seller Required Notices and Consents |
| Schedule 4(g) | Litigation |
| Schedule 4(i) | Seller Permits |
| Schedule 4(j)(iii) | Government Programs |
| Schedule 4(j)(vi) | Home Care Services |
| Schedule 4(l) | Financial Information |
| Schedule (4)(n) | Material Contracts |
| Schedule 4(q) | Intellectual Property |

## SCHEDULE 4(a)

## Seller Organizational Documents

The Company's Organization Documents, including its Certificate of Organization, Operating Agreement, and Good Standing Certificate.

**TO BE PROVIDED**

## SCHEDULE 4(f)

## Seller Required Notices and Consents

**NONE**

## SCHEDULE 4(g)

### Litigation

**Department of Labor litigation information to be provided.**

## SCHEDULE 4(i)

### Seller Permits

**PENNSYLVANIA DEPARTMENT OF HEALTH**

**PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES**

## SCHEDULE 4 (i)(iii)

## Government Programs

List all federal and state government program contract numbers including for Pennsylvania Medicaid and Pennsylvania Medicaid Home and Community Based Programs through the Community Health Choices Payors, with a PROMISe, National Provider Identifier number(s), and other Government Programs contract numbers.

- **Medicaid** (all waivers: Act150, Independent Waiver.....)

- **Keystone First**

- **UPMC**

- **PA Health and Wellness**

## SCHEDULE 4(j)(vi)

### Home Care Providers

A true and complete list of all Home Care Providers.

**To Be Provided.**

## SCHEDULE 4(l)

### Financial Information

A true and complete copy of all Financial Information.

**To Be Provided.**

## SCHEDULE 4(n)

### Material Contracts

List all written or oral agreements, contracts, or arrangements involving future obligations that purport to bind Buyer following the Closing.

**-Medicaid** (all waivers: Act 150, Independent Waiver...)

**- Keystone First**

**- UPMC**

**- PA Health and Wellness**

## SCHEDULE 4(q)

## Intellectual Property

List all patents, trademarks, trade names, service marks, domain names, social media copyrights, trade secrets, mask works, and other intellectual property.

**To Be Provided.**

# EXHIBIT B

## PARTNERSHIP AGREEMENT

This Confidential Partnership Agreement (this "Agreement") is entered into as of September 23, 2022 by and between (a) MELISSA GRAYSON and CHERITA BROWN, partners of NEIGHBORS QUALITY HOME CARE, and (b) BABY WILLIAMS and ANGELIA WILLIAMS, married persons. Collectively, MELISSA GRAYSON and CHERIT A BROWN, will maintain 80% ownership of NEIGHBORS QUALITY HOME CARE, and (b) BABY WILLIAMS and ANGELIA WILLIAMS will maintain 20% ownership of NEIGHBORS QUALITY HOME CARE, shall be referred to as the "Parties".

## BACKGROUND

WHEREAS NEIGHBORS QUALITY HOME CARE, is a registered home health care company with the Commonwealth of Pennsylvania, with a business address of 1 International Drive, Philadelphia, PA 19113.

NOW, THEREFORE, for good and valuable consideration, of $60,000, the receipt and sufficiency of which is hereby

## AGREED TERMS

1.       Payment by BABY WILLIAMS and ANGELIA WILLIAMS was made by an initial VISA Payment (see Exhibit A), for $25,000.00 on September 9, 2022. The remaining $35,000 of initial payment to be paid within 30 days of signed agreement by cashier check. The Parties acknowledge and agree that they are solely responsible for splitting the attorneys' fees and costs they incurred and that neither Party nor its attorney(s) will seek any award of attorneys' fees or costs. Within 18 (eighteen) months from the date of contract signing, Cherita Brown and Melissa Grayson agree to reimburse Baby Williams and Angelia Williams $60,000, to recover their initial investment. No interest will be incurred on this debt. Parties acknowledge prior initial investment by Cherita Brown to Melissa Grayson of $60,000.

2.       Parties agree that there are no other parties with an interest in the business operating as NEIGHBORS QUALITY HOME CARE, a registered home health care company with the Commonwealth of Pennsylvania, with a business address of 1 International Drive, Philadelphia, PA 19113. At no time can any partner incur debt for the business without agreement between all partners. Additionally, if any partner wishes to sell their interest in the said business, the other partners will have a first right to purchase the parting members share. If Melissa Grayson breaches the terms of the contract, and fails to repay initial investments to partners, partners can attach a lien against Melissa Grayson's personal property located at 11 Keeneland Court, Bear, DE 19701-3320 for initial investment recovery.

3.  .     Confidentiality of Agreement. · Parties expressly understand and agree that this Agreement and its contents (including, but not limited to, the fact of payment and the amounts to be paid hereunder) shall remain CONFIDENTIAL and shall not be disclosed to any third party whatsoever, except the Parties' counsel, accountants, financial advisors, tax professionals

retained by them, any federal, state, or local governmental taxing or regulatory authority, and the Parties' management, officers and Board of Directors, and except as required by law or order of court. Any person identified in the preceding sentence to whom information concerning this Agreement is disclosed is bound by this confidentiality provision and the disclosing party shall be liable for any breaches of confidentiality by persons to whom he/she/it has disclosed information about this Agreement in accordance with this paragraph. Nothing contained in this paragraph shall prevent any Party from stating that the Parties have "amicably resolved all differences," provided, however, that in so doing, the Parties shall not disclose the fact or amount of any payments made or to be made hereunder and shall not disclose any other terms of this Agreement or the settlement described herein. If any subpoena, order or discovery request (the "Document Request") is received by any of the Parties hereto calling for the production of the Agreement, such Party shall promptly notify the other Party hereto prior to any disclosure of same. In such case, the subpoenaed Party shall: (a) make available as soon as practicable (and in any event prior to disclosure), for inspection and copying, a copy of the Agreement it intends to produce pursuant to the Document Request unless such disclosure is otherwise prohibited by law; and (b) and, to the extent possible, shall not produce anything in response to the Document Request for at least ten (10) business days following such notice. If necessary, the subpoenaed Party shall take appropriate actions to resist production, as permitted by law, so as to allow the Parties to try to reach agreement on what shall be produced. This paragraph is a material part of this Agreement.

4.    Non-Disparagement. The Parties agree that, unless required to do so by legal process, [he/she/its officers and directors/their officers and directors] will not make any disparaging statements or representations, either directly or indirectly, whether orally or in writing, by word or gesture, to any person whatsoever, about the other Party or his/her/its spouse, attorneys or representatives, affiliates, or any of its directors, officers, employees, attorneys, agents, or representatives. For purposes of this paragraph, a disparaging statement or representation is any communication which, if publicized to another, would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, good character or product quality of the person or entity to whom the communication relates.

5.    Agreement is Legally Binding. The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs and estates.

6.      Entire Agreement.   The recitals set forth at the beginning of this Agreement are incorporated by reference and made a part of this Agreement. This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless in writing and signed by each of the parties hereto.

7.      Interpretation.   Should any provision of this Agreement be declared or be determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

The headings within this Agreement are purely for convenience and are not to be used as an aid in interpretation. Moreover, this Agreement shall not be construed against either Party as the author or drafter of the Agreement.

8.      Governing Law and Choice of Forum.   This Agreement is made and entered into within and shall be governed by, construed, interpreted and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the principles of conflicts of laws. Any action to enforce this Agreement shall be brought only in court.

9.      Authority to Execute Agreement.  By signing below, each Party warrants and represents that the person signing this Agreement on its behalf has authority to bind that Party and that the Party's execution of this Agreement is not in violation of any By-law, Covenants and/or other restrictions placed upon them by their respective entities.

10.     Effective Date.  The terms of the Agreement will be effective when an executed copy of this Agreement is delivered to all Parties. as described in paragraph 1 above (the "Effective Date"). Any breach of fiduciary duties will constitute breach of contract.


MELISSA GRAYSON

9/23/2022
DATE

CHERITA BROWN

9/23/2022
DATE

BABY WILLIAMS

DATE

9/23/22

ANGELIA WILLIAMS

DATE

9/23/22

# M&T Bank

**Understanding what's important®**

Bear Office

If you have any questions, please
call our Telephone Banking Center
at 1-800-724-2440

Today's Date:              Business Date:
09/23/2022                  09/23/2022

Time:  02:15 PM

Checking Deposit          $35,000.00
****6070

7003 /05                    97

Thanks for visiting us today.
We are happy to assist you!

© 2014 Navy Federal NFCU C36 (8-14)

NAVY FEDERAL
Credit Union.

PO Box 3000
Merrifield, VA 22119-3000
navyfederal.org

Serial No. 0455169617

Account No. *****7067

REMITTER: ANGELIA P WILLIAMS

Pay to the Order of  NEIGHBORS QUALITY HOME CARE

Date  09/22/22

Amount  $*********35000.00

Cashier's Check

Authorized Signature

88-7457
2580

# EXHIBIT C

## FIRST AMENDMENT TO
## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This First Amendment to Membership Interest Purchase Agreement (this "Amendment") dated January 25th, 2023 is by and by and among Melissa Greer-Grayson, with a residential mailing address of 11 Keeneland Court, Bear, DE 19701 ("Seller"), Neighbors Quality Home Care, LLC, a Pennsylvania limited liability company, with its principal place of business at 1 International Plaza, Suite 550, Philadelphia, PA 19113 ("Company"), and Citadel Home Care NJ, LLC, a New Jersey limited liability company, with its principal place of business at 13 Regency Way, Manalapan, New Jersey 07726, or its successors, assigns or nominees ("Buyer"). Seller, Company and Buyer each also sometimes referred to, individually, as a "Party" and, collectively, the "Parties." Any and all schedules, exhibits and attachments hereto referenced in this Amendment are hereby incorporated into this Amendment by reference and made a part hereof.

### BACKGROUND

The Parties entered into a Membership Interest Purchase Agreement effective as of November 23, 2022 ("MIPA").

The Parties desire to amend the MIPA pursuant to the terms and conditions of this Amendment.

NOW THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.      Capitalized terms used in this Amendment, but not defined herein, shall have the meanings given to such terms in the MIPA.

2.      Section 1(d)(3)(a)(ii) of the MIPA is hereby amended and supplemented to reflect the following:

> Escrow Deposit. At the time of execution of the Agreement, Buyer deposited the sum of Two Hundred Fifty Thousand ($250,000) Dollars with Buyer's counsel, Jeffrey G. DiAmico, Esq. (Semanoff Ormsby Greenberg & Torchia, LLC), escrow agent ("Escrow Agent"), which is currently held in escrow ("Escrow Deposit", and together with the Working Capital Deposit, collectively, the "Deposit"). The Parties acknowledge and agree that the Escrow Agent is hereby authorized to return the Escrow Deposit to the Buyer following execution of this Amendment, and following such return of the Escrow Deposit to the Buyer, all references to "Deposit" in the Agreement shall refer only to the Working Capital Deposit.

3.      The MIPA, including specifically Sections 3(c)(1)(2) and (3) of the MIPA, is hereby amended and supplemented to reflect the following: Buyer shall have until three (3) business days following Buyer's notice to Seller of Buyer's election to proceed forward with the

Agreement's current terms and conditions in order to file any such applications, or complete any other actions, required of Buyer pursuant to the Agreement.

4. The MIPA, as amended by this Amendment, shall remain in full force and effect and is hereby ratified and reaffirmed by the Parties. This Amendment may be executed by the Parties in counterparts and may be delivered by the Parties via digital signature or pursuant to electronic transmission, and such delivery shall have the same force and effect as an original signature. This Amendment shall be governed by, construed and enforced in accordance with the substantive and procedural laws of the Commonwealth of Pennsylvania.

*[Signatures appear on next page.]*

COMPANY:

NEIGHBORS QUALITY HOME CARE, LLC

Attest: _____

Name:

By: _Melissa Greer-Grayson_

Melissa Greer-Grayson,
Sole Member, CEO and President

STATE/COMMONWEALTH OF _Delaware_

COUNTY OF _New Castle_

On this _25th_ day of January, 2023, before me, the undersigned officer, personally appeared Melissa Greer-Grayson, who acknowledged herself to be the CEO, PRESIDENT and SOLE MEMBER of the said NEIGHBORS QUALITY HOME CARE, LLC, and that she, as such officers and member, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the entity by herself as CEO, PRESIDENT and SOLE MEMBER.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

Lonnie Fueston
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires 10/25/2024

**IN WITNESS WHEREOF**, intending to be legally bound, the parties execute and deliver this First Amendment to Membership Interest Purchase Agreement effective as of the last date set forth below.

WITNESS:                                    SELLER:

_____                     _____
Name:                                       Melissa Greer-Grayson

STATE/COMMONWEALTH OF Delaware

COUNTY OF New Castle

On this 25th day of January, 2023, before me, the undersigned officer, personally appeared Melissa Greer-Grayson, known to me (or satisfactorily proven) to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purpose therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

Lonnie Fueston
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires 10/25/2024

[02599101;v1]
1471405.2

BUYER:

CITADEL HOME CARE NJ, LLC

Attest: _____          By: _____
Name:                                  Cheskel Spitzer, Sole Member

STATE/COMMONWEALTH OF _New York_

COUNTY OF _Kings_

On this _25th_ day of January, 2023, before me, the undersigned officer, personally appeared Cheskel Spitzer, who acknowledged himself to be the SOLE MEMBER of the said CITADEL HOME CARE NJ, LLC, and that he, as such member, being authorized to do so, executed the foregoing instrument, for the purposes therein contained, by signing the name of the entity by himself as SOLE MEMBER.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

LORELEI TEEGARDEN
STATE OF NEW YORK
NOTARY PUBLIC
Qualified in Kings County
01TE6417743
MY COMMISSION EXPIRES 05/26/2025

NOTARY PUBLIC

# EXHIBIT D

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: U.S. Dept. of Labor, Office of the Solicitor, 1835 Market Street, Mailstop SOL/22, Philadelphia, PA 19103

Address of Defendant: 1 International Boulevard, Suite #550, Philadelphia, PA 19113

Place of Accident, Incident or Transaction: Philadelphia, PA

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☐

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____   _____   _____
　　　　　　　　　　　　　Must sign here
　　　　　　　　　　*Attorney-at-Law / Pro Se Plaintiff*　　　　*Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☑ 11. All other Federal Question Cases
　　*(Please specify):*　FLSA (29 U.S.C. s. 201, et seq.)

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
　　*(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Kyle D. Stelmack , counsel of record or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: 03/21/2023　　　/s/ Kyle D. Stelmack　　　PA 322944
　　　　　　　　　*Attorney-at-Law / Pro Se Plaintiff*　　　*Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 10/20)

Case 2:23-cv-01774-KSM Document 1 Filed 03/21/23 Page 1 of 2

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Julie Su, Acting Secretary of Labor, United States Department of Labor | Neighbors Quality Home Care, LLC & Melissa Grayson |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Philadelphia**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kyle D. Stelmack, U.S. Dept. of Labor, 1835 Market Street, Mailstop SOL/22, Philadelphia, PA 19103, (215) 861-4856

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☒1 | U.S. Government Plaintiff | ☐3 | Federal Question *(U.S. Government Not a Party)* |
| ☐2 | U.S. Government Defendant | ☐4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☒710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☒1 Original Proceeding | ☐2 Removed from State Court | ☐3 Remanded from Appellate Court | ☐4 Reinstated or Reopened |
| ☐5 Transferred from Another District *(specify)* | ☐6 Multidistrict Litigation - Transfer | ☐8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Fair Labor Standards Act, 29 U.S.C. Section 201, et seq.
Brief description of cause:
Failure to pay proper overtime, failure to maintain proper employment records

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒Yes ☐No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
03/21/2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Kyle D. Stelmack

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless diversity. Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE SU, ) | |
| ACTING SECRETARY OF LABOR, ) | |
| UNITED STATES DEPARTMENT OF LABOR, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:23-CV-1096 |
| ) | |
| NEIGHBORS QUALITY HOME CARE, LLC., ) | JURY TRIAL DEMANDED |
| and MELISSA GRAYSON ) | |
| ) | |
|     Defendants. ) | |

### COMPLAINT

Plaintiff, Julie Su, Acting Secretary of Labor, United States Department of Labor

("Plaintiff"), brings this action to enjoin Neighbors Quality Home Care, L.L.C., a Pennsylvania

limited liability company, and Melissa Grayson, individually and as owner, officer, and manager

of the aforementioned company (collectively "Defendants"), from violating the provisions of

Sections 7, 11(c), 15(a)(2), and 15(a)5) of the Fair Labor Standards Act of 1938, as amended, 29

U.S.C. §201, *et. seq.* ("the Act"), and for judgement against Defendants in the total amount of

back wage compensation found by the Court to be due to the employees of Defendants in

liquidated damages.

1.     Jurisdiction of this action is conferred upon the Court by Section 17 of the Act, 29

U.S.C. §217, and by 28 U.S.C. §§1331 and 1345.

2.     Defendant Neighbors Quality Home Care, L.L.C. ("NQHC") is a limited liability

company duly organized under the laws of the Commonwealth of Pennsylvania. NQHC's

registered address and principal place of business is 1 International Boulevard, Suite #550,

Philadelphia, Pennsylvania 19113, within the jurisdiction of this Court. NQHC is engaged in a

domestic homecare business operating out of this same location, within the jurisdiction of this Court.

3.      Defendant Melissa Grayson is the president and sole owner of Defendant NQHC. Ms. Grayson directed employment practices and has directly or indirectly acted in the interest of NQHC in relation to its employees at all relevant times herein, including recruiting, hiring, firing, setting pay rates for employees, and setting the conditions of employment for employees of NQHC. These actions all took place within the jurisdiction of this Court.

4.      Defendants employ persons in domestic service for profit, which affects commerce per Section 2(a)(5) of the Act. NQHC's employees are employed as home health aides ("HHAs") to provide in-home care services to NQHC's clients.

5.      At all times relevant herein, Defendants have been an enterprise within the meaning of Section 3(r) of the Act, in that the Defendants have been, through a unified operation of common control, engaged in the performance of related activities for a common business purpose. 29 U.S.C. §203(r). These activities constituted (and/or were related to) the provision of health care services to customers, in furtherance of the Defendant's business purposes. 29 U.S.C. §203(r).

6.      At all times relevant herein, Defendants have employed, and are employing, employees in the activities of an enterprise engaged in commerce. Specifically, employees worked as home health care workers. Further, at all times relevant herein, Defendants have had annual gross volume sales made or done in an amount not less than $500,000, thereby affording coverage to all of their employees pursuant to Section 3(s)(1)(A) of the Act, 29 U.S.C. §203(s)(1)(A)(ii).

7.       Defendants violated the provisions of Sections 7 and 15(a)(2) of the Act by employing their employees, specifically home health care workers, in an enterprise engaged in commerce or handling goods or materials that have been moved in or produced for commerce, for workweeks longer than those prescribed in Section 7 of the Act without compensating said employees for employment in excess of the prescribed hours at rates not less than one and one-half times their regular rates. Therefore, Defendants are liable for the payment of unpaid overtime compensation and an equal amount of liquidated damages under Section 16(c) of the Act.

8.       For example, during the time period from at least March 14, 2022, through at least November 20, 2022, Defendants either failed to compensate certain of their employees employed as HHAs who worked over 40 hours in a workweek at rates not less than one and on-half times their regular rates or failed to pay employees for all hours worked in excess of forty per workweek. During this time period, these employees worked at least one hour in excess of forty per week. During this time period, employees worked an average of approximately 67 hours per workweek.

9.       Defendants paid employees at established regular hourly rates ranging between approximately $10.50 and $15.00 per hour. Defendants paid employees at these straight time regular rates for all hours up to forty per workweek. From at least March 14, 2022, through at least September 4, 2022, Defendants did not pay the required time and one-half premium rate for overtime hours worked in excess of forty per week. For hours worked in excess of forty per week, Defendants paid employees their straight-time hourly rates for all hours worked, or an amount less than one and one-half the employees' regular rates, on the face of Defendants' payroll records.

10.     During the time period from at least August 7, 2022 through at least November 20, 2022, Defendants failed to pay employees for all of their hours worked in excess of forty per workweek. Employees would record all of the time worked in a system known as the HHA Exchange. Defendants would not pay employees for all hours which were recorded in the HHA Exchange but would instead pay them for a number of hours that was less than what was reflected in the HHA Exchange. The unpaid hours included hours which were in excess of forty hours per workweek.

11.     Defendants violated the provisions of Sections 11(c) and 15(a)(5) of the Act in that the Defendants failed to make, keep, and preserve adequate and accurate records of their employees, which they maintained as prescribed by the regulations issued and found at 29 C.F.R. Part 516.

12.     For example, due to their practices of paying straight time for overtime and failing to pay for all overtime hours worked by employees, Defendants failed to keep and preserve payroll records for employees for at least three years, including accurate records of employees' daily and weekly hours worked, total weekly straight-time earnings, and total weekly overtime premium pay. 29 C.F.R. §§516.2(a), 516.5(a).

WHEREFORE, cause having been shown, the Acting Secretary prays for judgment against Defendants providing the following relief:

> (1) For an injunction issued pursuant to Section 17 of the Act permanently enjoying and restraining Defendants, their officers, agents, servants, employees, and those persons in active concert or participation with Defendants who receive actual notice of any such judgment from violating the provisions of Section 7, 11(c), 15(a)(2) and 15(a)(5) of the Act;

(2) For judgment pursuant to Section 16(c) of the Act finding Defendants liable for unpaid overtime compensation dure to certain of Defendants' current and former employees listed in the attached Schedule A for the period from at least March 14, 2022, through at least November 20, 2022, and for an equal amount due to certain of Defendants' current and former employees in liquidated damages. Additional amounts of back wages and liquidated damages may also be owed to certain current and former employees of Defendants listed in the attached Schedule A for violations continuing after November 20, 2022, and may be owed to certain current and former employees presently unknown to the Acting Secretary for the period covered by this Complaint, who may be identified during this litigation and added to Schedule A;

(3) For an injunction issued pursuant to Section 17 of the Act restraining Defendants, their officers, agents, employees, and those persons in active concert or participation with Defendants, from withholding the amount of unpaid overtime compensation found due to Defendants' employees; and

(4) In the event liquidated damages are not awarded, for an Order awarding prejudgment interest computed at the underpayment rate established by the Secretary of Treasury pursuant to 26 U.S.C. §6621.

FURTHER, Plaintiff prays that this Honorable Court award costs in his favor, and an order granting such other and further relief as may be necessary and appropriate.

Respectfully submitted,

Mailing Address:

**UNITED STATES DEPARTMENT OF LABOR**

U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103

Seema Nanda
Solicitor of Labor

Oscar L. Hampton III
Regional Solicitor

(215) 861-4856 (voice)
(215) 861-5162 (fax)
Stelmack.kyle.d@dol.gov

Adam Welsh
Wage & Hour Regional Counsel

Date: March 21, 2023

/s/ Kyle D. Stelmack
By: Kyle D. Stelmack
PA ID # 322944

Attorneys for Plaintiff

## SCHEDULE A

| FIRST NAME | LAST NAME |
|---|---|
| Talib | Abdul-Zaboor |
| Temia | Billups |
| Nafis | Brown |
| Tyree | Burton |
| Armani | Carolina |
| Melinda | Clark |
| Tanya | Dantzler |
| Aestair | Daniels |
| Ketera | Fullen |
| Wanda | Glover |
| Maria | Graham |
| Wendell | Hicks |
| Enijah | Howard |
| Tahir | Ingram |
| Terrell | Johns |
| Everly | Mancuso |
| Michelle | Martung |
| D'Juan | Mashore |
| Emmanuel | Murray |
| Bernadette | Perry |
| Joshua | Reed |
| Tiffany | Reed |
| Richard | Rosario |
| Donna | Saunders |
| Tanisha | Scott |
| Tacora | Seabrook |
| Kelly | Sechrist |
| Stacey | Stayman |
| Tamara | Stukes |
| Kaija | Summers |
| Khady | Sy |
| Joseph | Trotter |
| Iris | Warren |
| Chanta | Weathers |
| Artisher | White |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| MARTIN J. WALSH, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | : :  |
|  | : |
| Plaintiff, | : |
|  | : : |
| v. | : Civil Action No. |
|  | : : |
| NEIGHBORS QUALITY HOMECARE LLC, and MELISSA GRAYSON, | : : : |
|  | : |
| Defendants. | : |
|  | : : : |

### CONSENT JUDGMENT

Plaintiff, Secretary of Labor, United States Department of Labor, hereinafter referred to as "Plaintiff" or "the Secretary," has filed his Complaint alleging violations of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, et seq. (hereinafter "the Act"). Defendants named above, hereinafter referred to as "Defendants" or "Employers," waive formal service of process of the Summons and Complaint, waive their Answer and any defense which they may have and hereby agree to the entry of this Consent Judgment without contest. It is, therefore, upon motion of the attorneys for Plaintiff and for cause shown:

ORDERED, ADJUDGED, AND DECREED that Defendants, their officers, agents, servants, and all persons acting or claiming to act on their behalf and interest be, and they hereby are, permanently enjoined and restrained from violating the provisions of Sections 6, 7, 11(c), and 15 of the Act, in any manner, specifically:

1.      Defendants shall not, contrary to Section 6 of the Act, pay to any of their employees who in any workweek are engaged in commerce or in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the Act, wages at rates less than those which are now, or which in the future may become, applicable under Sections 6 and 15(a)(2) of the Act.

2.      Defendants shall not, contrary to Section 7 of the Act, employ any of their employees including, but not limited to, any of their employees working at One International Plaza, suite 550, Philadelphia, Pennsylvania, or at any business location owned, operated, and/or controlled by Defendants, and at any other business location at which their employees perform work, in any workweek when they are engaged in commerce or employed in an enterprise engaged in commerce, within the meaning of the Act, for workweeks longer than the hours now, or which in the future become, applicable under Sections 7 and 15(a)(2) of the Act, unless the said employees receive compensation for their employment in excess of the prescribed hours at a rate equivalent to one and one-half times the regular rates applicable to them.

3.      Defendants shall not fail to make, keep, and preserve adequate records of their employees and of the wages, hours, and other conditions and practices of employment maintained by them including, but not limited to, any of their employees working at One International Plaza, suite 550, Philadelphia, Pennsylvania, or at any business location owned, operated, and/or controlled by Defendants, and at any other business location at which their employees perform work, as prescribed by the Regulations issued pursuant to Section 11(c) and 15(a)(5) of the Act and found at 29 C.F.R. Part 516.

4.      Defendants shall not discharge or take any retaliatory action against any of their employees, whether or not directly employed by Defendants, because the employee engages in any of the following activities pursuant to Section 15(a)(3) of the Act:

     i.     Discloses, or threatens to disclose, to a supervisor or to a public agency, any activity, policy, or practice of the Employers or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of the Act, or a rule or regulation promulgated pursuant to the Act;

     ii.     Provides information to, or testifies before, any public agency or entity conducting an investigation, hearing or inquiry into any alleged violation of the Act, or a rule or regulation promulgated pursuant to the Act, by the Employers or another employer with whom there is a business relationship;

     iii.     Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of the Act, or a rule or regulation promulgated pursuant to the Act.

It is further ORDERED, ADJUDGED and DECREED by the Court that:

5.     Defendants are enjoined and restrained from withholding gross back wages in the sum total amount $82,149.52, and are jointly and severally liable for the payment of $82,149.52 in liquidated damages, due certain employees and former employees of Defendants set forth and identified in Schedule A, which is attached as Exhibit A hereto and made a part hereof.

6.     Regarding the matter of the civil money penalty, Defendants have agreed that the amount currently due and payable is $29,052.00 that they are jointly and severally liable for this amount, that such assessment has become the final order of the Secretary of the Department of Labor, and that they waive any and all rights to appeal or contest such assessment. As such, Defendants shall pay pursuant to Section 16(e) of the Act, a civil money penalty in the amount of **$29,052.00** no later than thirty days (30) days after the entry of this Consent Judgment. Payment may be made online by ACH transfer, credit card, or debit card by going to https://www.pay.gov/public/form/start/77734139 or www.pay.gov. Alternatively, payment may

3

be made by certified check, bank check, or money order, payable to "Wage and Hour Division, U.S. Department of Labor," and mailed to the Northeast Regional Office, Wage and Hour Division, "Wage and Hour Division, U.S. Department of Labor," and mailed to the Northeast Regional Office, Wage and Hour Division, 1835 Market Street, 19th Floor, Philadelphia, PA 19103-2968.

7.      Defendants shall pay gross back wages and liquidated damages in the total amount of $164,299.06 for violations of the overtime provisions of the Act by Defendants alleged to have occurred during the period beginning May 1, 2020 to November 20, 2022, ("relevant period"). This amount shall represent the full extent of back wages and liquidated damages owed by Defendants for the relevant period to the employees set forth and identified on the attached Schedule A. It is further agreed that the overtime compensation and liquidated damage payments by the Defendants in the amounts as specified above are in the nature of back wages and liquidated damages pursuant to the provisions of the Act. Defendants shall remain responsible for all tax payments considered to be the "employer's share," including, but not limited to, FICA.

i.      The provisions of this Consent Judgment relative to back wage and liquidated damages payments shall be deemed satisfied when Defendants deliver to the designated representatives of the Plaintiff payment in the amount of $164,299.06 within thirty (30) days of the entry of this Judgment by the Court. Payment may be made online by ACH transfer, credit card, or debit card by going to https://www.pay.gov/public/form/start/77689032 or www.pay.gov. Alternatively, payment may be in the form of a certified check, bank check, or money order made payable to the order of "**Wage and Hour Division – Labor**," and mailed to:

**U.S. Department of Labor, Wage & Hour Division**
**Northeast Regional Office, Wage and Hour Division,**

**1835 Market Street 19th Floor
Philadelphia, PA 19103-2968.**

The check or money order shall bear the following reference: **Case ID# 1962596.**

      ii.     The Secretary, through the Wage and Hour Division, shall distribute the back wages (less any applicable federal taxes, withholdings, and deductions) and liquidated damages payments to the employees and former employees, or to their estates, as set forth in Schedule A. Schedule A will show for each individual the gross back pay due (subject to applicable legal deductions), and liquidated damages. Any sums not distributed to the employees or former employees on Schedule A, or to their estates, because of inability to locate the proper persons or because of such persons' refusal to accept such sums, shall be deposited with the Treasurer of the United States pursuant to 29 U.S.C § 216(c).

      iii.    To the best of their ability and based upon information it currently has in its possession, Defendants shall provide to Plaintiff the social security number, last known address, last known phone number and last known email address of each employee or former employee due money under this Consent Judgment at the time of the initial lump sum payment.

      iv.     The provisions of this Consent Judgment shall not in any way affect any legal right of any individual not named in Exhibit A, nor shall the provisions in any way affect any legal right of any individual named in Exhibit A to file any action against Defendants for any violations alleged to have occurred outside the relevant period.

     8.     Neither Defendants nor anyone on their behalf shall directly or indirectly solicit or accept the return or refusal of any sums paid under this Consent Judgment. Any such amount shall be immediately paid to the Secretary for deposit as above, and Defendants shall have no further obligations with respect to such returned monies. If recovered wages have not been claimed by the employee or the employee's estate within three years of the entry of this Consent

Judgment, the Secretary shall deposit such money with the Treasury in accordance with Section 16(c) of the Act.

9.     Further, the parties agree that the instant action is deemed to solely cover Defendants' business and operations for the relevant period for all claims raised in the Complaint as a result of the Secretary's investigation.  The parties agree that the filing of this action and the provisions of this Judgment shall not, in any way, affect, determine, or prejudice any and all rights of any person specifically named on Schedule A or the Secretary for any period after November 20, 2022, or any persons, be they current or former employees, not specifically named on Schedule A, insofar as such rights are conferred and reserved to said employees by reason of Section 16(b) of the Act

10.     Defendants agree that they are employers within the meaning of Section 3(d) of the Fair Labor Standards Act, 29 U.S.C. § 203(d).

11.     By entering into this Consent Judgment, Plaintiff does not waive his right to conduct future investigations of Defendants under the provisions of the FLSA and to take appropriate enforcement action, including assessment of civil money penalties pursuant to Section 16(e) of the FLSA, with respect to any violations disclosed by such investigations.

It is FURTHER, ORDERED, ADJUDGED, AND DECREED that each party will bear its own fees and other expenses incurred by such party in connection with any stage of this proceeding including, but not limited to, attorney fees which may be available under the Equal Access to Justice Act, as amended.

_____

UNITED STATES DISTRICT JUDGE

Dated: _____, 2023

6

For the Secretary:

Defendants hereby consent to the entry of this Judgment.

Andrea Luby
Solicitor of Labor

For Defendants Neighbors Quality Home Care LLC and Melissa Grayson

Oscar L. Hampton III
Regional Solicitor

_____
Melissa Grayson
Individually, and as owner of Neighbors Quality Home Care

_____
Senior Trial Attorney
PA ID # 321609

U.S. Department of Labor
Office of the Solicitor, Region III
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103-2968
215-861-5128
215-861-5162 (fax)
luby.andrea@dol.gov

U.S. DEPARTMENT OF LABOR

Attorneys for Plaintiff
U.S. Department of Labor

**SCHEDULE A**

| Full Name | Back-Wages | Liquidated Damages | Total |
|---|---|---|---|
| Abdul-Zaboor, Talib | $7,124.00 | $7,124.00 | $14,248.00 |
| Billups, Temia | $1,859.00 | $1,859.00 | $3,718.00 |
| Brown, Nafis | $468.00 | $468.00 | $936.00 |
| Burton, Tyree | $2,912.00 | $2,912.00 | $5,824.00 |
| Carolina, Armani | $1,078.00 | $1,078.00 | $2,156.00 |
| Clark, Melinda | $11,426.00 | $11,426.00 | $22,852.00 |
| Daniels, Aestair | $462.00 | $462.00 | $924.00 |
| Dantzler, Tanya | $3,366.00 | $3,366.00 | $6,732.00 |
| Fullen, Ketera | $1,742.00 | $1,742.00 | $3,484.00 |
| Glover, Wanda | $2,106.00 | $2,106.00 | $4,212.00 |
| Graham, Maria | $2,671.50 | $2,671.50 | $5,343.00 |
| Hicks, Wendell | $312.00 | $312.00 | $624.00 |
| Howard, Enijah | $386.88 | $386.88 | $773.76 |
| Ingram, Tahir | $31.88 | $31.88 | $63.76 |
| Johns, Terrell | $214.00 | $214.00 | $428.00 |
| Mancuso, Everly | $1,594.81 | $1,594.81 | $3,189.62 |
| Martung, Michele | $72.77 | $72.77 | $145.54 |
| Mashore, D'Juan | $5,941.00 | $5,941.00 | $11,882.00 |
| Murray, Emmanuel | $3,557.00 | $3,557.00 | $7,114.00 |
| Perry, Bernadette | $9,607.00 | $9,607.00 | $19,214.00 |
| Pollard, Naishe | $605.00 | $605.00 | $1,210.00 |
| Reed, Joshua | $273.00 | $273.00 | $546.00 |
| Reed, Tiffany | $46.20 | $46.20 | $92.40 |
| Rosario, Richard | $341.00 | $341.00 | $682.00 |
| Saunders, Donna | $974.75 | $974.75 | $1,949.50 |
| Scott, Tanisha | $759.00 | $759.00 | $1,518.00 |
| Seabrook, Tacora | $369.60 | $369.60 | $739.20 |
| Sechrist, Kelly | $404.14 | $404.14 | $808.28 |
| Stayman, Stacey | $96.00 | $96.00 | $192.00 |
| Stukes, Tamara | $1,300.00 | $1,300.00 | $2,600.00 |

| | | | |
|---|---|---|---|
| Summers, Kaija | $1,564.00 | $1,564.00 | $3,128.00 |
| Sy, Khady | $9,780.00 | $9,780.00 | $19,560.00 |
| Trotter, Joseph | $7,020.00 | $7,020.00 | $14,040.00 |
| Warren, Iris | $1,170.00 | $1,170.00 | $2,340.00 |
| Weathers, Chanta | $242.00 | $242.00 | $484.00 |
| White, Artisher | $273.00 | $273.00 | $546.00 |
| | **$82,149.53** | **$82,149.53** | **$164,299.06** |